# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **JAMES CRAIG TAYLOR,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10-CV-0651-CVE-PJC** |
| | ) | |
| **ANITA TRAMMELL, Warden[1],** | ) | |
| | ) | |
| **Respondent.** | ) | |

## OPINION AND ORDER

Before the Court is Petitioner's 28 U.S.C. § 2254 petition for writ of habeas corpus. (Dkt. # 1). Petitioner, James Craig Taylor, is a state prisoner appearing pro se. Respondent filed a response (Dkt. # 5) and provided the state court records (Dkt. ## 7, 8, 9, 10 ,11, 12, 13) necessary for the adjudication of Petitioner's claims. Petitioner filed a reply (Dkt. # 14). For the reasons discussed below, the petition for writ of habeas corpus shall be denied.

### BACKGROUND

Petitioner was charged in Pawnee County District Court, Case No. CF-2004-0018, with Malice Aforethought Murder in the First Degree (Count I), and Carrying a Firearm After Former Conviction of a Felony (Count II). (Dkt. # 11-5, O.R. at 1). A jury convicted Petitioner of Felony Murder in the Second Degree (Count I), and Possession of a Firearm After Former Conviction of

---

[1]Petitioner is currently in custody at the Oklahoma State Penitentiary, in McAlester, Oklahoma. Pursuant to Rule 2(a), Rules Governing Section 2254 Cases in the United States District Courts, Anita Trammell, Warden, is the proper respondent. Therefore, Anita Trammell, Warden, is hereby substituted as the respondent in this case. The Court Clerk shall be directed to note such substitution on the record.

a Felony (Count II).  (Dkt. # 13-1, O.R. at 1377-78).  During the three week trial, the jury heard

testimony supporting the following factual background.

In the early morning hours of October 13, 2001, Pawnee County Sheriff Dwight Woodrell

was on his way home after successfully serving a search warrant with Deputy Brian Hill and other

deputies of the Pawnee County Sheriff's Office.  (Dkt. # 9-2, Tr. Vol. III at 233-35).  Deputy Hill

testified that, as he was driving home, he heard a radio transmission from Sheriff Woodrell, stating

that he was behind Spess Oil Company, in Cleveland, Oklahoma, with a man named Robert Weller.

Id. at 238.  The Sheriff asked the dispatcher to contact Spess Oil to verify Weller's employment and

requested "a couple of deputies for backup."  Id. at 238-39.  Deputy Hill and three others

immediately responded.  Id. at 239-40.  When the backup deputies arrived at Spess Oil a few

minutes later, Deputy Hill observed that though the Sheriff's car was there with headlights on bright

and his spotlight facing towards the building, he did not see the Sheriff.  Id. at 247-48.  Deputy Hill

thought the Sheriff was "in a foot pursuit," so he directed everyone to spread out and look for the

Sheriff.  Id. at 248.  After a few minutes of searching, Deputy Burns found the Sheriff in the front

of his car.  Id. at 249.  Deputy Burns told Deputy Hill, "I think he's shot."  Id.

Deputy Hill radioed the Pawnee County dispatch and requested an ambulance and Life

Flight.  Id. at 250.  Deputy Hill testified that Sheriff Woodrell was alive and laying face first across

the front seat, onto the passenger seat.  Id. at 250-51.  He noticed a large amount of bleeding from

the Sheriff's back.  Id. at 252.  Sheriff Woodrell died shortly after he was transported to the hospital

in Cleveland, Oklahoma.  (Dkt. # 9-3, Tr. Vol. IV at 158-161).  Dr. Michael Sibley, M.D., a forensic

pathologist at the Office of the Chief Medical Examiner for the State of Oklahoma, testified that

Sheriff Woodrell suffered six gunshot wounds – four in the back, one in the front abdomen, and one on the back of the right upper arm. Id. at 171.

The Oklahoma State Bureau of Investigation (OSBI) led the investigation.  OSBI investigators took numerous photographs of the crime scene, attempted to lift fingerprints from the sheriff's car, took tire impressions, and recovered a cigarette butt. (Dkt. # 9-3, Tr. Vol. IV at 221-223). Forensics investigators recovered bullets and bullet fragments, a total of eight pieces of evidence, and identified them as bullets from a ".38 Special or .357" handgun. (Dkt. # 9-4, Tr. Vol. V at 37-38).  "[F]ive were all fired from the same bore," and the rest of the bullets and/or fragments did not have "enough individual strionic [sic] to say [they were] fired from the same gun." Id. at 44.

Jeffery Spess, manager of Spess Oil, testified that when he received a call in the early morning hours of October 13, 2001 from the Pawnee County dispatcher regarding Robert Weller, he could not recall an employee by that name, but he was not sure because of employee turnover. (Dkt. # 9-4, Tr. Vol. V at 111).  He told the dispatcher that he would go meet the Sheriff at the Spess Oil location. Id. at 112.  When he arrived at Spess Oil, the scene was already blocked off by several deputies' cars and Mr. Spess was told the Sheriff had been shot. Id. at 113.  Mr. Spess testified that, a few hours later, John Huntington, an OSBI investigator, escorted him around the area to determine whether anything was missing. Id. at 114-15, 119; see also Dkt. # 9-3, Tr. Vol. IV at 211-12.  Mr. Spess did not identify anything missing. (Dkt. # 9-4, Tr. Vol. V at 120).  A few days later, however, one of his employees, Tartus Bush, discovered some items missing from a welding truck. Id.  Mr. Spess went to the area and saw that several items were missing, including copper welding leads, an oxygen bottle, an acetylene bottle, the regulators from those bottles, hoses, and a cutting torch assembly. Id. at 120-21.  Though he could not identify the exact date the items were stolen, Mr.

3

Spess was able to testify that the items were on the truck in the days immediately preceding the murder. Id. at 135-38.

Investigators initially pursued several people of interest, including Richard Bowline, Jeremy Heitman, Ed Russell, and Edrow Roberts. (Dkt. # 9-6, Tr. Vol. VII at 229-231). The investigation did not reveal any individual named Robert Weller. Id. at 229. Investigators ruled out Ed Russell and Edrow Roberts because "they were at a[n] individual's house in Cleveland cooking methamphetamine the night of the murder, and that's where they was [sic] pretty much the whole night." Id. at 232. In January 2002, Lyle Springer, Justin Walker, James Taylor (Petitioner), and John Ridgway came to the attention of investigators. Id. at 236-37. In late January 2002, investigators "began speaking with Lyle Springer." Id. at 236. Investigators had their first interview with Ridgway on or before February 27, 2002. Id. at 237. On March 11, 2002, Ridgway met with investigators from Pawnee County and independently led them to Spess Oil, where he staged the position of three vehicles that were at Spess Oil the night of the murder: the Sheriff's vehicle and the two vehicles used by those responsible for the murder. Id. at 238-49.

At trial, the State relied on the testimony of Springer, Ridgway, and several jailhouse informants, to prove its case against Petitioner. Springer testified that, on October 13, 2001, Walker called him and asked Springer to meet him and to bring a pair of bolt cutters. (Dkt. # 9-5, Tr. Vol. VI at 49). Springer complied and, when he arrived at the meeting location, Shane Pinkston (Shane), Ridgway, and Petitioner were at that location with Walker, along with "a red Ford truck, . . . a Pathfinder, [and a] Mitsubishi-looking kind of car." Id. at 49-51. Springer testified that Walker said Walker needed to "get in my [Springer's] car and take [the bolt cutters] with him [Walker] because there was [sic] too many people in that truck." Id. at 52. Ridgway, Shane, and Petitioner were in

the truck.  Id.  Springer let Walker drive his car because Walker knew where he was going and Springer was "pretty messed up on Xanaxes" and he had "[done] some . . . methamphetamine earlier [in the day]."  Id. at 53.  Springer testified that Walker drove to an area behind a blue building.  Id. at 55.  Walker got out of the car and Springer stayed in the car and fell asleep.  Id. at 60-61.  The next thing Springer remembered, Walker was waking him up and telling him that "they had James" and that "you need to drive."  Id.  Walker "got back out of the car and headed back toward the building."  Id. at 61.  Springer got in the driver's seat and turned the car around, when he heard "more than two" gunshots.  Id. at 64.  Springer testified that when Walker got back in the car, Walker had a "black revolver" and it appeared to be the one that Springer had stolen "from a guy named Keith" and sold to Walker.  Id. at 62-63.  Springer then drove Walker to Walker's Uncle Earl's house, and Springer returned to his "trailer at the valley."  Id. at 64-68.

Next, the State presented the testimony of six jailhouse informants – Wesley Gunnells, Daniel Reese, James Rather, Jr., Josephy Giroux, Ronnie Haslip II, and Adam Vollmer.  See Dkt. ## 9-5, 9-6.  Wesley Gunnells was unavailable to testify at trial, but the trial court allowed his testimony from the preliminary hearing to be read into evidence.  (Dkt. # 9-5, Tr. Vol. VI at 23-38, 199).  All of the jailhouse informants testified that Petitioner had, individually and at different penal institutions and jails in Oklahoma, confessed to them that he and Walker had shot and killed Sheriff Woodrell.  See Dkt. ## 9-5, 9-6.

Ridgway was the State's main witness.  He testified that, on October 13, 2001, Petitioner called him and asked to use his bolt cutters.  (Dkt. # 9-8, Tr. Vol. IX at 80).  Petitioner asked Ridgway to bring the cutters to the "last free exit" on Highway 412 "past Sand Springs towards Mannford."  Id. at 82.  When Ridgway arrived, Petitioner was there with Shane and a red Ford truck.

Id. at 82-83.  After he gave the bolt cutters to Petitioner, Petitioner asked Ridgway "to go with him and Shane on a job that they're doing," a burglary.  Id. at 84-85.  Ridgway testified that Petitioner told him that they "were going to meet Justin and James and Tina there."  Id. at 85.  Petitioner wanted Ridgway to be their "jigger," or lookout man.  Id. at 85-86.  Ridgway testified that Petitioner had a black revolver with him.  Id. at 86.

Ridgway agreed, got into the truck, and Shane drove towards Cleveland, Oklahoma.  Id. at 88.  Ridgway testified that he fell asleep during the drive and when he woke up, they were behind "a light blue, tin building."  Id. at 88-89.  Ridgway testified that he fell asleep again, only to be awoken by the sound of a gunshot.  Id. at 90.  After he woke up, he looked in the side mirror of the truck, saw a vehicle behind the truck, and "[Petitioner] and [Walker] and somebody else . . . back there."  Id.  He thought the vehicle was a security patrol car.  Id.  Ridgway testified that he observed what was going on for "maybe five, ten seconds," but then closed his eyes because he did not "want to see what was going on."  Id. at 91.  He heard more gunshots, looked in the mirror again, and saw Walker with his "arm out . . . kind of in a downward motion, firing, firing the gun."  Id.

Ridgway testified Petitioner and Shane jumped in the truck soon after he saw Walker firing the gun.  Shane was yelling, "Why'd you shoot him?  You didn't have to shoot him."[2]  Id. at 109.  Ridgway testified that Petitioner told Shane to "[s]hut the F' up.  Get out of here."  Id.  Ridgway testified that, as Ridgway, Shane, and Petitioner were leaving in the truck, Walker "jumped in the back" and started "howling, like he was howling at the moon, and popped – shot a round up in the air."  Id. at 114.  Shortly after pulling onto the roadway, Walker tapped on the back window, "stuck

---

[2]The trial court admitted Shane's statement under the excited utterance exception to the hearsay rule.  (Dkt. # 9-8, Tr. Vol. IX at 106).

a pistol through the driver's side window at Shane, telling him to pull over, stop." Id. at 115. Shane stopped, Walker got into the driver's seat, and "Shane scooted over next to [Ridgway]." Id. They returned to the area at the last free exit where Ridgway's car was parked, and Ridgway, Walker, and Petitioner got out of the truck. Id. at 118.[3] Ridgway testified that Petitioner told him to take some tools out of the back of the truck, "because [Petitioner] knew that [Ridgway] was pretty much living in motel rooms and out of [his] vehicle and [Ridgway] was trying to . . . build [his] tool selection." Id. Ridgway's description of the tools and equipment in the back of the truck was similar to the items described as missing by Mr. Spess. Id. at 118-119.

Based on these facts and as stated above, Petitioner was charged with Malice Aforethought Murder in the First Degree (Count I) and the prosecution sought the death penalty as to that charge. However, at the conclusion of the first stage of trial, the jury found Petitioner guilty of Felony Murder in the Second Degree (Count I). See Dkt. # 9-13, Tr. Vol. XV at 120. At the conclusion of the second stage of trial, the jury found Petitioner guilty of Possession of a Firearm After Former Conviction of a Felony (Count II). See Dkt. # 10, Tr. Vol. XVI at 33. At the conclusion of the third stage, the jury recommended a term of life imprisonment for Count I, and five (5) years imprisonment for Count II. See id. at 65-66; Dkt. # 13-1, O.R. at 1379-80. On March 6, 2006, the

---

[3]At trial, the prosecutor acknowledged the discrepancies between the Springer and Ridgway accounts. (Dkt. # 9-13, Tr. Vol. XV at 37-39). The prosecutor stated, "Their stories differ. So if it was [sic] exactly alike, I'd really be worried." Id. at 37. The prosecutor also stated, "I don't know whether Lyle [Springer] came up with – you know, or he's just so blasted out of his mind he doesn't really remember who got in there, how he got away." Id. at 38.

trial court sentenced Petitioner in accordance with the jury's recommendation.[4]  (Dkt. # 13-3, O.R. at 1783).  Petitioner was represented at trial by attorneys Gretchen Mosley and Wayne Woodyard of the Oklahoma Indigent Defense System (OIDS).

On March 13, 2006, Petitioner, represented by Mosley, filed notice of intent to appeal.  (Dkt. # 13-2, O.R. at 1401).  Thereafter, on April 5, 2006, Petitioner, continuing to be represented by Mosley, filed a motion for a new trial on grounds of juror misconduct, denial of due process, and newly discovered evidence.  (Dkt. # 13-3, O.R. at 1571).  On May 3, 2006, Petitioner filed a supplemental motion for a new trial, providing notice of additional newly discovered evidence.  Id. at 1602.  On June 23, 2006, Petitioner filed a second supplemental motion for a new trial and the trial court held a hearing on the motion.  Id. at 1789.  On August 18, 2006, the trial court denied Petitioner's motion for a new trial.  (Dkt. # 8-8, Tr. Hr'g Aug. 18, 2006).

Petitioner perfected a direct appeal to the Oklahoma Court of Criminal Appeals (OCCA).  Represented by OIDS attorneys Traci J. Quick and Kathleen Smith, Petitioner raised nine propositions of error, as follows:

> Proposition I:     The evidence presented at trial was insufficient to corroborate the accomplice testimony of John Ridgway and Lyle Springer and, therefore, to sustain a conviction under the requirements of the Fourteenth Amendment of the United States Constitution and corresponding provisions of the Oklahoma Constitution.

---

[4]Walker was also charged with Malice Aforethought Murder in the First Degree and Carrying Firearm After Felony Conviction in Pawnee County District Court, Case No. CF-2004-0017.  See www.oscn.net.  On April 13, 2006, Walker pled guilty to Second Degree Murder and received a sentence of thirty (30) years imprisonment.

Proposition II:        The trial court committed reversible error by refusing to instruct the jury that Lyle Springer and John Ridgway were accomplices as a matter of law and accordingly violated Appellant's rights to due process of law in violation of the Fourteenth Amendment of the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

Proposition III:       The evidence was insufficient to prove Grand Larceny thus Appellant's conviction for second degree felony murder based on that predicated [sic] crime violates the requirements of the Fourteenth Amendment of the United States Constitution and the corresponding provisions of the Oklahoma Constitution.

Proposition IV:       Admission of improper and irrelevant evidence concerning Appellant's alleged gang affiliation violated his rights under the Fourteenth Amendment to the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

Proposition V:        The prosecution's failure to charge the offense of grand larceny deprived Appellant of this rights secured to him under the Sixth and Fourteenth Amendments to the United States Constitution as well as Article II, § 7 and 20 of the Oklahoma Constitution.

Proposition VI:       Appellant was denied a fair adversarial testing of the prosecution's case through the State's nondisclosures of material exculpatory evidence, and through the trial judge's subsequent failure to grant Appellant's motion for a new trial based on these nondisclosures, contrary to the Fourteenth Amendment to the United States Constitution and the corresponding provisions of the Oklahoma Constitution.

Proposition VII:      The prosecutor's misstatements of the law deprived Appellant of a fair trial in violation of the Fourteenth Amendment of the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

Proposition VIII:     Appellant was denied effective assistance of counsel in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9, and 20 of the Oklahoma Constitution.

9

Proposition IX:      The accumulation of errors deprived Appellant of a fair trial and the due process of law secured to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 19, and 20 of the Oklahoma Constitution.

(Dkt. # 5-3).  On March 6, 2007, prior to the disposition of his appeal, Petitioner filed a motion in the OCCA for a new trial based on newly discovered evidence.  (Dkt. # 5-4).  On January 23, 2008, the OCCA affirmed the Judgment and Sentence of the district court and denied Petitioner's motion for a new trial, stating that the newly discovered "evidence supplied by [Petitioner] only tends to discredit or impeach State witnesses and therefore is insufficient to warrant a new trial." (Dkt. # 5-3 at 12).  On February 12, 2008, Petitioner filed a petition for a rehearing (Dkt. # 5-5).  The OCCA denied the petition for rehearing on March 3, 2008 (Dkt. # 5-6).

On May 1, 2009, Petitioner filed an application for post conviction relief in Pawnee County District Court.  (Dkt. # 5-7 at 1).  On May 21, 2010, the court denied relief.  Id.  Petitioner, represented by Mosley, appealed to the OCCA and raised three propositions of error:

Proposition I:       The Trial Court denied Mr. Taylor the right to present a defense that another person committed the crime for which he was charged and to confront witnesses against him by excluding evidence critical to his defense in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

A.      Direct appeal counsel could have and should have raised the errors alleged herein on direct appeal.  The record was preserved for appeal.

Proposition II:      Petitioner should be granted a new trial now on grounds that testimony from Kristy Kay Timmerman was critical to his defense, and statutes of limitations now immunize her from prosecution for almost any potential crime and she cannot claim a privilege against self incrimination to avoid testifying about events that occurred in 2001 or before.

A.      Direct appeal counsel could have and should have raised the Statute of Limitations issue on direct appeal.

10

> Proposition III:     Petitioner should be granted a new trial now based on newly
> discovered evidence that supports his claims in parts I and II that Ed
> Russell admitted to another person that he had killed the Pawnee
> County Sheriff.

(Dkt. # 5-9). On September 16, 2010, the OCCA affirmed the denial of post-conviction relief. (Dkt.

# 5-8).

Petitioner timely filed his pro se petition for a writ of habeas corpus.[5] (Dkt. # 1). Petitioner

raises seven (7) grounds of error, as follows:

> Ground I:       The State failed to disclose material exculpatory and impeachment evidence
> to the defense prior to trial, including witness recantations and information
> about promises and threats made by the district attorney's office in order to
> obtain informant testimony and cooperation, and knowingly presented false
> testimony to the Court and jury.

> Ground II:      Newly discovered evidence revealed that Mr. Taylor was denied due process
> of law insofar as it revealed post-trial deals and consideration received by
> State's informant/accomplice witnesses about which the defense and jury
> were unaware at trial, recantations of state's witnesses after the trial, new
> information that showed informant witnesses gave false testimony at trial,
> and established a pattern of State coercion and intimidation prior to and
> during trial to obtain informant testimony.

> Ground III:     The Trial Court deprived Mr. Taylor of the right to present a defense that
> some other person committed the crime and to rebut or impeach OSBI
> investigator Dennis Francini's [sic] claim that all other suspects had been
> eliminated.

> Ground IV:      The Evidence was insufficient to support the conviction on Second Degree
> Felony Murder, where the state's evidence was so unworthy of belief that no
> rational fact finder could find guilt beyond a reasonable doubt and the
> evidence did not establish each of the elements of the underlying felony.

> Ground V:       Testimony about gang affiliation and that Mr. Taylor solicited the murder of
> two witnesses violated Mr. Taylor's right to due process and a fair trial.

---

[5]Petitioner's trial counsel, Gretchen Mosely, states that she assisted with the preparation of
the pro se habeas petition. (Dkt. # 1 at 59). However, she has not entered an appearance in this
habeas action, nor did she sign Petitioner's reply to Respondent's response. (Dkt. # 14).

Ground VI:      Mr. Taylor was never given notice that he would have [to] defend against the charge of grand larceny as a basis for second degree felony murder.

Ground VII:     The trial court failed to instruct the jury on applicable Oklahoma law which lowered the State's burden of proof and deprived Mr. Taylor of due process of law.

(Dkt. # 1).  Respondent argues that the decision by the OCCA as to Grounds I, II, and IV was not contrary to or an unreasonable application of Supreme Court law, that Grounds V, VI, and VII are matters of state law and are not subject to federal habeas corpus review, and that Ground III is procedurally defaulted for purposes of habeas relief.  (Dkt. # 5).

## *ANALYSIS*

**A.      Exhaustion/Evidentiary hearing**

As an initial matter, the Court must determine whether Petitioner meets the exhaustion requirements of 28 U.S.C. § 2254(b).  See Rose v. Lundy, 455 U.S. 509, 510 (1982).  Respondent argues that Ground III, claiming that the trial court deprived Petitioner the right to present a defense of a third party perpetrator, "was not raised on direct appeal or in his application for post-conviction relief." (Dkt. # 5 at 22).  Thus, Respondent argues that it is unexhausted.  Id.  However, Respondent also argues that "the OCCA would procedurally bar the claim pursuant to its Rule 5.4, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (2010)."  Id.; see also Dkt. # 5-8 at 2 ("Petitioner has exhausted his State remedies regarding the issues raised in his direct appeal and application for post-conviction relief.  Subsequent application on any of the issues is BARRED.").  As a result, Respondent concedes that Petitioner's claim is "considered exhausted and procedurally defaulted for purposes of federal habeas relief."  (Dkt. # 5 at 22 (citing Thomas v. Gibson, 218 F.3d 1213, 1221 (10th Cir. 2000))).  Petitioner states that this "is an outrageous claim, since almost the entire brief on post-conviction centered on this specific claim."  (Dkt. # 14 at 2).

12

After reviewing the post-conviction petition in error and supporting brief, the Court finds that Petitioner did present most of the claims raised in Ground III to the district court in his application for post-conviction relief, and all of the claims in Ground III were presented to the OCCA on post-conviction appeal.  See Dkt. # 5-9.  In its order affirming the denial of post-conviction relief, the OCCA stated that "[a]ny issue that could have been previously raised, but was not, is waived and may not be the basis of a subsequent post-conviction application."  (Dkt. # 5-8 at 1).  The Court finds that Petitioner has exhausted state court remedies for Ground III.

Also, after reviewing the record, the Court finds that the first claim raised in Ground II, newly discovered evidence of Ridgway's reduced federal sentence in exchange for his testimony at Petitioner's trial, was not presented to the OCCA.  Petitioner presented this claim only to the Pawnee County District Court in his second supplemental motion for a new trial.  (Dkt. # 13-3, O.R. at 1789).  Therefore, the Court finds that Petitioner failed to exhaust this claim.  However, in light of the procedural posture of this case, it would be futile to require Petitioner to return to state court to exhaust this claim.  Thus, there is an absence of available State corrective process, see 28 U.S.C. § 2254(b)(1)(B), and Petitioner's claim is not barred by the exhaustion requirement.

Respondent concedes, see Dkt. # 5 at 2, and the Court agrees that Petitioner's remaining claims were raised on direct or post-conviction appeal and are exhausted.

In addition, the Court finds that an evidentiary hearing is not warranted as Petitioner has not met his burden of proving entitlement to an evidentiary hearing.  See Williams v. Taylor, 529 U.S. 420 (2000); Miller v. Champion, 161 F.3d 1249 (10th Cir. 1998).

**B.      Claims adjudicated by the OCCA**

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the standard to be applied by federal courts reviewing constitutional claims brought by prisoners challenging state convictions.  Under the AEDPA, when a state court has adjudicated a claim, a petitioner may obtain federal habeas relief only if the state decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 402 (2000); Neill v. Gibson, 278 F.3d 1044, 1050-51 (10th Cir. 2001).  When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner.  See Bell v. Cone, 535 U.S. 685, 699 (2002); Hooper v. Mullin, 314 F.3d 1162, 1169 (10th Cir. 2002).  Furthermore, the "determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

**1.      Failure to disclose exculpatory and impeachment evidence (Ground I)**

In Ground I of the petition, Petitioner claims that the State failed to disclose exculpatory and impeachment evidence.  (Dkt. # 1 at 8).  Petitioner cites three particular pieces of evidence: (1) the recantation of State's witness, Wesley Gunnells, in the form of a signed affidavit; (2) the recantation of Rachel Welch, then girlfriend of the State's star witness, Ridgway, regarding her statements to law enforcement that implicated Petitioner; and (3) an affidavit from witness, Jeffrey Brooks.  Id. at 8, 10, 11.  These issues were raised in Petitioner's motion for a new trial.  See Dkt. # 13-3, O.R.

14

at 1571, 1602.  Petitioner argues that these three pieces of evidence "went directly to the credibility of the State's crucial informant/accomplice witnesses that they never turned over to [Petitioner]'s defense."  (Dkt. # 1 at 8).

On appeal, the OCCA noted that the "trial court found the evidence had been suppressed and that it was favorable to the defense therefore there was a 'technical violation' of Brady[ v. Maryland, 373 U.S. 83 (1963)]."  (Dkt. # 5-3 at 8).  However, the OCCA also agreed with the trial court that the evidence was not material and the trial court did not abuse its discretion in denying the motion for a new trial.  Id.  As a result, the OCCA concluded that, even if the evidence had been disclosed, the result of the proceeding would not be different and Petitioner was not deprived of a fair trial. Id.  Respondent argues that the OCCA's decision was not contrary to or an unreasonable application of Supreme Court law and the OCCA's findings of fact are entitled to a presumption of correctness on habeas review.   (Dkt. # 5 at 15, 20).

The  United  States  Supreme  Court  has  stated  that  the  prosecutor  has  a  duty  to  disclose evidence favorable to an accused "even though there has been no request by the accused, and that the duty encompasses impeachment evidence as well as exculpatory evidence." Strickler v. Greene, 527 U.S. 263, 280 (1999) (citing Brady, 373 U.S. at 87; United States v. Agurs, 427 U.S. 97, 107 (1976); United States v. Bagley, 473 U.S. 667, 676 (1985)).  "Such suppression of evidence amounts to a constitutional violation only if it deprives the defendant of a fair trial. . . . [A] constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." Bagley, 473 U.S. at 678.  The Supreme Court explained that the test for materiality of evidence is as follows:

> [E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

Id. at 682.   Suppression of exculpatory evidence by the state "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution." Brady, 373 U.S. at 87.  Impeachment evidence implicates a criminal defendant's due process rights when the reliability of a given witness may be determinative of the defendant's guilt or innocence. Giglio v. United States, 405 U.S. 150, 154 (1972).

After a review of the record, the Court finds that the OCCA's decision is not contrary to federal law or Supreme Court precedent.  First, though the State did possess information during Petitioner's trial that Wesley Gunnells had recanted his preliminary hearing testimony,[6] Petitioner has failed to show how this Brady violation undermines confidence in the outcome of the trial.  At the hearing on Petitioner's motion for a new trial, the State explained that it failed to disclose Gunnells' recantation because it was filed with information in Walker's case and was never looked at for information relevant to Petitioner's trial. (Dkt. # 8-7, Tr. Mot. Hr'g at 35-36).  Thus, the State argued that it did not knowingly present perjured testimony at trial.  Id. at 36.  The trial court found

---

[6]Over the objection of Petitioner's trial counsel, Wesley Gunnells' preliminary hearing testimony was read into the record because Gunnells was unavailable to testify at trial. (Dkt. # 9-5, Tr. Vol. VI. at 199).  Gunnells testified that he overheard a conversation between Petitioner and Justin Walker when he gave them a ride.  (Dkt. # 7-1, Tr. Prelim. Hr'g at 36-37).  In that conversation, Gunnells overheard Petitioner say that they "needed to split up, they couldn't be around each other," and that "Justin said something about he just shot a[n] officer or something to that effect." Id. at 37.  After his trial, Petitioner's counsel learned of Gunnells recantation in a conversation with one of Walker's investigators, and that the information had been turned over to the State as part of the discovery in Walker's case, several months before Petitioner's trial. (Dkt. # 8-7, Tr. Mot. Hr'g June 23, 2006 at 35-36).  Nonetheless, the State presented Gunnells' preliminary hearing testimony at Petitioner's trial.  Petitioner raised this issue in a motion for a new trial.

that Gunnells' testimony was erroneously admitted, but that the error was harmless and not material in light of the other evidence presented at trial.  (Dkt. # 8-8, Tr. Hr'g Aug. 18, 2006).  The OCCA affirmed this decision.  (Dkt. # 5-3 at 7).  Nothing in the record shows this decision was contrary to federal law.  While the State did use Gunnells' testimony in its closing arguments as corroboration for Ridgway's accomplice testimony, it was one of approximately ten pieces of corroboration evidence used in closing arguments by the State.  See Dkt. # 9-13, Tr. Vol. XV at 35-49.  While it may have been valuable impeachment evidence, Petitioner has not demonstrated that the failure to disclose this evidence undermines confidence in the outcome of the trial.

Petitioner also claims that, after trial, he learned of Rachel Welch's recantation of her statement to investigators.  (Dkt. # 1 at 10-11).  Petitioner states that Welch told State investigators, and investigators for Walker, that she lied about Petitioner's and Walker's involvement in the murder at the request of Ridgway.  Id. at 11; Dkt. # 8-7, Tr. Mot. Hr'g June 23, 2006 at 139-140.  Petitioner argues that, had he known this information at the time of his trial, he "surely would have presented Ms. Welch as a witness [because it] would have substantiated a pattern from Mr. Ridgway of recruiting people to lie . . . in order to help him sell his story."  (Dkt. # 1 at 11).  Respondent argues that Petitioner presented several witnesses to impeach the State's witnesses and to introduce the alleged conspiracy of Ridgway against Petitioner.  (Dkt. # 5 at 19).

After review of the record, the Court finds that this information was not material.  Welch did not testify at Petitioner's trial.  The Court acknowledges that, had Welch testified as a witness for the defense, the jury may have placed more confidence in her testimony because, unlike other witnesses for the defense, Welch was not an inmate.  However, the Court cannot  predict what she would have said at trial nor can it "consider the credibility" of her anticipated testimony.  Messer

17

v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996).  Petitioner bears the burden of establishing a reasonable probability of a different result if this information had been put before the jury. Petitioner presented several witnesses at trial to discredit the testimony of Ridgway.  Petitioner has failed to show that, had Welch testified, the outcome of his trial would be different.

Finally, Petitioner claims that he has an affidavit from Jeffrey Brooks, a witness for Petitioner, that rebuts the rebuttal testimony of District Attorney's investigator, Mike Shea.  (Dkt. # 1 at 11-12).  Over numerous objections from Petitioner, Shea testified that the testimony Brooks gave at the preliminary hearing was "totally reversed" from what he gave in his original statement to investigators.  (Dkt. # 9-12, Tr. Vol. XIII at 172).   Shea testified that, after the preliminary hearing, Brooks told him that he had to give that testimony because "his family had been threatened that [sic] if he testified to what he had told us originally."  Id. at 174.   Shea also testified that, just before Brooks testified at Petitioner's trial, Brooks told Shea[7] that "he couldn't tell the truth, that he had to stick with his original story that he told at the preliminary hearing, out of fear of his own safety and the safety of his family."  Id. at 178.  The trial court denied Petitioner's motion for a mistrial, id. at 197, and denied Petitioner's motion for a continuance to investigate further violations of the rule of sequestration, id. at 199.  In his affidavit, Brooks states that he "never told Mike Shea that I was afraid for me or my family or that I was threatened in any way to testify for the defense." (Dkt. # 8-7, Tr. Hr'g June 23, 2006, Def. Ex. 6 at 147).

---

[7]At trial, the court acknowledged that there was a "technical violation of the rule" of sequestration of witnesses when Shea talked to Brooks.  (Dkt. # 9-12, Tr. Vol. XIII at 193). However, sua sponte, the court "retroactively excuse[d] Mr. Shea from the rule of sequestration of witnesses [and found that u]nless there's some demonstrable prejudice to the defense, it's a non-issue in the case.  And in view of . . . Mr. Shea's unique position, . . .he is – has a responsibility for assisting in presenting this trial, assisting the District Attorney's Office."  Id. at 200.

Neither the trial court nor the OCCA made findings or provided analysis on the issue of Brooks' affidavit.  (Dkt. # 8-8, Tr. Hr'g Aug. 18, 2006; Dkt. # 5-3 at 7).  However, the OCCA found that the trial court did not abuse its discretion in denying Petitioner's motion for a new trial.  (Dkt. # 5-3 at 7).  After reviewing the record, the Court finds that the OCCA's decision was not contrary to federal law.  Though Shea's testimony could have allowed the jury to draw inferences about Petitioner, Shea never directly stated that Petitioner was the one who threatened Brooks.  Further, Petitioner's counsel likely nullified any inference that it was Petitioner who had allegedly threatened Brooks, as demonstrated by the following exchange during cross-examination:

> Q:    [Mr. J. Robertson] . . . Did you know that [Jeff Brooks] testified that Justin Walker had beat him nearly to death.  Did you know that?
>
> A:    [Shea]  I didn't know he testified to that, but I was aware of that.
>
> Q:    But you knew it, didn't you?
>
> A:    Yes.
>
> Q:    And at the time of the preliminary hearing when [Brooks] didn't come in and testify, you knew then that Justin had beat him nearly to death; isn't that correct?
>
> A:    Justin and some friends, yes.
>
> Q:    Okay.  James Taylor was not involved in any way in that alleged beating, was he?
>
> A:    Not to my knowledge.

(Dkt. # 9-12, Tr. Vol. XIII at 180).  In addition, Petitioner has failed to show how Brooks' affidavit undermines confidence in the outcome reached by the jury.  Further, Petitioner fails to show that the State violated the <u>Brady</u> rule with regard to the information Brooks disclosed in his affidavit.  Petitioner seems to argue only that he was denied the opportunity to "controvert[] Shea's rebuttal testimony about Brooks at trial."  (Dkt. # 1 at 12).

19

Thus, after a review of the record and transcripts, the Court finds that Petitioner has failed to show that the OCCA's decision was contrary to, or an unreasonable application of, federal law. Further, Petitioner has failed to show that the <u>Brady</u> violations undermined confidence in the outcome of the trial. Petitioner's request for habeas relief on Ground I is denied.

### 2.      Newly discovered evidence (Ground II)

In his second ground for habeas relief, Petitioner claims that he has newly discovered evidence that "reveal[s] that Petitioner was denied due process of law." (Dkt. # 1 at 13). Petitioner organizes the newly discovered evidence into four categories: (1) post-trial deals; (2) witness recantations; (3) witness intimidation; and (4) false testimony. <u>See id.</u> at 14-20. Petitioner argues that he was not aware of the deals, considerations, intimidation, and recantations at the time of trial and that this information is material because it would have been important for the jury's assessment of witnesses' credibility. <u>Id.</u> at 14, 15, 16, 19, 20. Respondent states that these claims were raised in a motion for a new trial filed with the OCCA. (Dkt. # 5 at 16). The OCCA found that the new "evidence supplied by [Petitioner] only tends to discredit or impeach State witnesses and therefore is insufficient to warrant a new trial." (Dkt. # 5-3 at 12). The OCCA concluded that "[e]ven had the evidence included in the motion for a new trial been introduced at trial, there is no reasonable probability the outcome of the trial would have changed." <u>Id.</u> Respondent argues that the OCCA's decision was not contrary to, or an unreasonable application of, federal law as determined by the Supreme Court. (Dkt. # 5 at 21).

"Under Oklahoma law, the OCCA will not grant relief on a motion for a new trial based on newly discovered evidence unless, inter alia, a defendant was prejudiced by its omission and consequently deprived of a fair trial." <u>Pruitt v. Parker</u>, 388 F. App'x 841, 846 (10th Cir. 2010)

(unpublished)[8] (citing Sellers v. State, 973 P.2d 894, 895 n.12 (Okla. Crim. App. 1999) (denying motion for a new trial due to newly discovered evidence and stating that "[a] defendant must show that the evidence is (1) material, (2) could not with due diligence have been discovered before trial, (3) is not cumulative, and (4) creates a reasonable probability that the outcome of the trial would have been different had it been introduced")).   After a review of the record, the Court finds that Petitioner has failed to offer evidence or show that the OCCA's decision was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court.   Petitioner has not shown that the evidence he claims is "newly discovered" is more than impeachment evidence and that it would have resulted in a different outcome.   Further, Petitioner's claims are conclusory or assert evidence that was presented at trial.

### a.     Post-Trial Deals

Petitioner claims that five of the State's witnesses, Ridgway, Joseph D. Giroux, Ronnie D. Haslip, James P. Rather, Jr., and Daniel P. Reese, received post-trial aid as a result of their testimony at Petitioner's trial.   (Dkt. # 1 at 14-15).   Ridgway was facing federal criminal charges during the pendency of Petitioner's trial.   Petitioner claims that Ridgway's sentence on his federal conviction, thirty-seven months with credit for time served, plus three years probation, was the result of a deal brokered in exchange for his testimony against Petitioner.[9]   Id. at 15.   Based on time served, Ridgway was released from custody the same day he was sentenced.   Id.   Petitioner states that, at

---

[8]This and any other unpublished opinions are cited herein as persuasive authority, pursuant to Tenth Circuit Rule 32.1.

[9]John Ridgway was charged in N.D. Okla. Case No. 02-CR-0030 with Felon in Possession of a Firearm and Ammunition.   He was arrested on February 8, 2002 and entered into a plea agreement on July 8, 2002.   He was sentenced on June 22, 2006, approximately 3 1/2 months after Petitioner was convicted.

Ridgway's sentencing, the Assistant United States Attorney informed the federal judge about Ridgway's "substantial assistance to the State of Oklahoma in [Petitioner's] case," and that the State's case "'stood or fell' on Ridgway's testimony." Id. at 14-15.  Petitioner argues that Ridgway's sentence is new evidence that Petitioner "could not have discovered" during trial and that it "would have been extremely important to the jury's consideration of Mr. Ridgway's credibility." Id. at 15.

Petitioner also claims that Giroux, Haslip, Rather, and Reese, four of the jailhouse informants, each received a favorable letter addressed to the Oklahoma Pardon and Parole Board, signed by investigator, Mike Shea, only weeks after Petitioner's conviction. Id. at 15; see also Dkt. # 5-4 at 14.  Petitioner claims that this letter demonstrates that "the State planned to send a favorable letter to the Parole Board on their behalf," despite the fact that the four witnesses testified that "they had been offered nothing in exchange for their testimony."  (Dkt. # 1 at 15-16).  Petitioner also complains that, even though Haslip and Rather testified that they had requested favorable parole recommendations but nothing was promised, their testimony merely served "to bolster the inmates' credibility by creating the impression that the State would not assist these inmates in return for their testimony." Id.

First, the Court notes that Petitioner's new evidence claim regarding Ridgway's reduced federal sentence was not presented to the OCCA for review.  See Dkt. ## 5-1, 5-4, 5-9.  Instead, it

was presented to the state district court in the second supplemental motion for a new trial.[10]  (Dkt.

# 13-4, O.R. at 1794-1811).  After a careful review of the record, the Court finds that this claim of

newly discovered evidence is unexhausted.  Nevertheless, even if the federal claim is unexhausted

or procedurally barred, the Court may choose to deny relief on the merits pursuant to 28 U.S.C. §

2254(b)(2).  Smith v. Mullin, 379 F.3d 919, 927 (10th Cir. 2004) ("We need not determine the level

of deference owed the OCCAs conclusions as to these various misconduct claims or which [claims]

are barred on independent and adequate state grounds. Where an issue may be more easily and

succinctly affirmed on the merits, judicial economy counsels in favor of such a disposition.")); see

also Moore v. Schoeman, 288 F.3d 1231, 1235 (10th Cir. 2005).  As discussed below, the Court

finds that the second ground for relief shall be denied on the merits.

Contrary to Petitioner's claims, Ridgway's federal sentence is not new evidence sufficient

to show Petitioner was prejudiced by its omission.  At Petitioner's trial, Ridgway was specifically

asked on cross-examination about the pending sentencing for his federal conviction.  See Dkt. # 9-8,

Tr. Vol. IX at 141.  The following exchange took place:

---

[10]The Court acknowledges that Petitioner mentioned the "sentencing deal" in his cumulative error claim (Proposition IX) on direct appeal, arguing that "the evidence of guilt was extremely weak, based almost exclusively on the dubious, self-serving testimony of John Ridgway, who bartered his testimony against Mr. Taylor in exchange for consideration on a federal weapons charge, reaping a substantially reduced sentence in the bargain." (Dkt. # 5-1 at 48).  Additionally, Petitioner mentioned the claim in his post-conviction appeal brief, stating that during his trial, the District Attorney's Office "made deal after deal with jailhouse informants and uncorroborated, unreliable, self-proclaimed accomplices in an effort to build a case. . . . The State's acknowledged star witness, John Ridgeway [sic], who cried at trial about needing to do the right thing, was given two years' [sic] probation in federal court on gun charges at the request of Pawnee County in exchange for his testimony against Mr. Taylor."  (Dkt. # 5-9 at 19).  However, Petitioner never presented the issue as a claim of newly discovered evidence to the OCCA.

Q:      [Mr. J. Robertson] And are you now pending in federal court with charges of felon in possession of a firearm?

A:      [Ridgway]  I'm awaiting sentencing, yes.

Q:      Okay.  And your sentencing has been postponed for how long?

A:      Three years, I think, two and a half or three years.  A long time.

Q:      Pending your testimony in this case; is that correct?

A:      I would assume.

Q:      You know that, do you not?

A:      I would assume.  That's something my attorney did after the fact.

Q:      All right, sir.  Have you asked your attorney why you've been waiting for three years to be sentenced in your federal case?

A:      I've been given several excuses, sir.  The Judge was sick, and different – new judge, but yea, I believe it's because they're waiting on this, to see what this does.

Q:      Your attorney and you have tried to use your testimony and your story in this case to benefit you in your federal case; have you not?

A:      My attorney has, sir, I didn't.

. . .

Q:      Is your attorney on your behalf asking in your federal case for a – what's called a downward depature?

A:      Yes, sir.

. . .

Q:      In federal court, you're aware, are you not, that sentencing guidelines in your situation, where firearms are involved and you have prior felonies would result in a long prison sentence, wouldn't it?

A:      Forty-seven to sixty-two months is what I was told.

. . .

24

Q:     And you're trying for a downward departure; is that correct?

A:     My attorney is.

Id. at 141-43.  Although Ridgway had not yet been sentenced on his federal conviction, Petitioner's

jury knew that Ridgway's attorney was seeking a downward departure in his federal sentencing as

a result of his testimony at Petitioner's trial.  Petitioner has failed to demonstrate that he was

deprived of a fair trial. There is no merit to this unexhausted claim and habeas corpus relief is

denied.

As to Petitioner's claim concerning Shea's letter to the Parole Board, Petitioner has failed

to show that the OCCA's decision, that the "evidence supplied by [Petitioner] only tends to discredit

or impeach State witnesses and therefore is insufficient to warrant a new trial," see Dkt. # 5-3 at 12,

was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court.

Further, Petitioner has not shown that an agreement with the four witnesses was withheld from

Petitioner during trial, nor has he shown that the witnesses refused to testify without an agreement.

Finally, even if this letter or the promise of this letter had been introduced at trial, Petitioner fails

to show that the outcome of his trial would have been different.  Habeas relief is denied.

### b.     Witness Recantation

In addition to the recantations raised in Ground I, Petitioner claims that Daniel Reese "now

admits he lied to law enforcement, the magistrate at the preliminary hearing, and the jury when he

stated [that Petitioner] had confessed to him that he killed the sheriff."  (Dkt. # 1 at 17).  Petitioner

presented this claim and an affidavit from Reese to the OCCA in his motion for a new trial.  (Dkt.

# 5-4 at 16-17).  In the affidavit, Reese states that Petitioner never confessed to him, that the OSBI

added information to his typed statement concerning the type of gun used, and that he "was under

25

the impression that [ADA] Henry and his investigator Mike Shea would see to it that I [Reese] was released from prison and sent home in exchange for my testimony.  Mr. Henry specifically told me he would do everything to send me home." Id. at 16-17.  Petitioner argues he could not have known this at trial for "obvious" reasons, meaning that it "would have disrupted the prosecution's case, and may have cost Reese the freedom which Mr. Henry and Mr. Shea had promised him." (Dkt. # 1 at 17).

After a review of the record, the Court finds that Petitioner has failed to show the denial of a new trial by the OCCA was contrary to federal law.  Reese was one of several witnesses who testified against Petitioner.  Petitioner has failed to demonstrate that the outcome of his trial would have been different without Reese's testimony.  In the absence of Reese's testimony, the State had enough evidence to support the conviction.

### c.    Witness Intimidation

Next, Petitioner claims that State's witness, Jimmy Spencer, alleged that investigator Mike Shea "threatened to file charges on Spencer and his wife if he did not testify at [Petitioner's] trial." (Dkt. # 1 at 19).  Spencer did not testify at Petitioner's trial.  Spencer claims he refused to testify for the State at Petitioner's trial because "he did not want anything more to do with the trial." Id. at 19. Petitioner argues that this claim, in addition to the claims from Gunnells and Brooks concerning "threats of additional charges or punishment made by the State . . . [are] indicative of an overall pattern or coercion and manipulation." Id.

Petitioner admits, however, that a member of his defense team interviewed Spencer during Petitioner's trial in an effort to determine why he was not testifying. Id. at 18-19.  Oklahoma has long followed the rule that "[a] new trial on the ground of newly discovered evidence will not be

26

granted unless it appears that with the exercise of due diligence the evidence could not have been discovered before the trial." Isom v. State, 26 P.2d 952, 954 (Okla. Crim. App. 1933); see also Wilhoit v. State, 816 P.2d 545, 546 (Okla. Crim. App. 1991). Petitioner fails to show that Spencer's claim of coercion could not have been discovered in the absence of due diligence. Ultimately, Spencer was not a witness at trial, only at the preliminary hearing. Therefore, any claim that Spencer's preliminary hearing testimony was coerced by Shea has no bearing on the probability of a different outcome at Petitioner's trial. Habeas corpus relief is denied on this claim.

### d.    False Testimony

Finally, Petitioner claims that Harlan McIntosh, an inmate who was housed with State's witness James Rather at Lawton Correctional Facility, contacted Petitioner's defense team and alleged that James Rather admitted that he "lied about [Petitioner] confessing to the crime at bar." (Dkt. # 1 at 19-20). McIntosch claims that Rather decided to lie "because he was mad at [Petitioner] for refusing to back him up when [Rather] got in trouble for beating up another inmate, allegedly at [Petitioner]'s request." Id. at 20. However, Petitioner admits that both Billy Hicks and Jack Lowe testified at trial that Rather was lying. Id. Yet, Petitioner attempts to distinguish McIntosh's statement from the testimony of Hicks and Lowe by arguing that "McIntosh's information provides a motivation" for Rather's false allegations against Petitioner. Id.

After a review of the testimony, the Court finds that McIntosh's statements are cumulative impeachment evidence. At Petitioner's trial, Lowe testified that,

> [Rather] said that he was going to do a bunch of lying on Mr. James Taylor just to
> try and make him look worse than what he was, and so that they could get parole and
> get transferred to lower security and get time cuts and stuff like that, they are just
> going to use that in their benefit . . . .

(Dkt. # 9-11, Tr. Vol. XII at 149).   Hicks, who was also known as a jailhouse lawyer, offered

testimony about specific conversations with Rather:

> Q:    Mr. Hicks, in your conversations with Mr. Rather, Hockersmith and the others
>       you've mentioned, Mr. Young, did Mr. Rather ever tell you that the information was
>       fabricated?
>
> A:    Yes, sir, that was [sic] his exact words.
>
> Q:    Those were his exact words?
>
> A:    Yes
>
> Q:    And whenever you first were consulted about this and asked for help there as a legal
>       assistant, did you know that the information they were trying to present was
>       fabricated?
>
> A:    No, sir, I did not know that.
>
> Q:    How did you find out?  Tell me how you found out.
>
> A:    While out on the exercise yard, which is the little dog cages, James Rather,
>       Hockersmith, and Young, all three of them, confided in me and said, 'Hey, look, you
>       know, we made these stories up because we need these letters.'
>
> Q:    All right.  After you heard that, did you do something different then?
>
> A:    Absolutely.
>
> Q:    What did you do?
>
> A:    I advised all three of them, including their other little buddy, told them they was [sic]
>       all going to get theirself [sic] a bunch of time for perjury if they followed through
>       with that, and they said they ain't no way for nobody to prove it [sic].
>
> [objection – hearsay, sustained]
>
> Q:    Let's just confine this to what Mr. Rather said, okay?  What'd you say to Mr. Rather
>       in your conversation to him and what'd he say to you?
>
> A:    I told Mr. Rather, "Look, man, what you're doing is you're setting yourself up for
>       a charge of perjury, that and you're going to put a man on death row for something
>       that you're lying about.  That ain't cool."

Q:      Okay.  And what was his response to that?

A:      His exact words was, is they're going to fry him regardless, so he might as well get something out of the deal.

Id. at 178-180.  Thus, evidence of a motivating factor for Rather's testimony is not new and is cumulative impeachment evidence. Lowe provided some explanation for Rather's motivation when he testified that Rather wanted to make Petitioner look "worse than what he was."  Further, the motivation for Rather's testimony against Petitioner is immaterial to the outcome of his trial. Petitioner is not entitled to habeas corpus relief on this claim.

Thus, after a review of all claims raised in Ground II, the Court concludes that Petitioner has failed to show that the OCCA's decision was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court.  Habeas relief as to ground two is denied.

### 3.      Insufficient evidence (Ground IV)

In Ground IV, Petitioner claims that the evidence "was insufficient to support the conviction on Second Degree Felony Murder, where the State's evidence was so unworthy of belief that no rational fact finder could find guilt beyond a reasonable doubt and the evidence did not establish each of the elements of the underlying felony."  (Dkt. # 1 at 35).  Petitioner argues that the State's case was "based mostly on the testimony of two accomplices who were never charged in the case," and "six jailhouse snitches" to corroborate the story of the two accomplices.  Id. at 35-36.  Petitioner also argues that the "State's evidence failed to prove essential elements of [grand larceny] beyond a reasonable doubt."  Id. at 43-44.  Respondent argues that Petitioner fails to show that the OCCA's decision was contrary to, or an unreasonable application of, Supreme Court precedent.  (Dkt. # 5 at 30).  Further, Respondent argues that the "State proved beyond a reasonable doubt that Petitioner murdered the sheriff while committing the felony of grand larceny."  Id.  On direct appeal, the

OCCA found that "the evidence [was] sufficient to find beyond a reasonable doubt Appellant guilty of the underlying felony of grand larceny." (Dkt. # 5-3 at 4).  It determined that the "evidence was sufficient for the jury to reasonably conclude that the missing items were stolen the night of the Sheriff's murder and that the value of the missing items was over $500.00." Id. at 5.

In a habeas proceeding, the Court reviews the sufficiency of the evidence "in the light most favorable to the prosecution" and asks whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "Jackson claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." Coleman v. Johnson, 132 S. Ct. 2060, 2062 (2012).  First, on direct appeal, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Id. (citing Cavazos v. Smith, 565 U.S. 1 (2011)).  "This standard of review respects the jury's responsibility to weigh the evidence and to draw reasonable inferences from the testimony presented at trial." Dockins v. Hines, 374 F.3d 935, 939 (10th Cir. 2004) (citing Jackson, 443 U.S. at 319).  The court must "accept the jury's resolution of the evidence as long as it is within the bounds of reason." Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993).  Second, on habeas review, the federal court may overturn a state court decision rejecting a sufficiency of the evidence claim only if the state court decision was objectively unreasonable. Johnson, 132 S. Ct. at 2062.

In applying the Jackson standard, the Court looks to Oklahoma law to determine the substantive elements of the relevant criminal offense. Jackson, 443 U.S. at 324 n.16.  Petitioner was charged with Malice Aforethought Murder in the First Degree, but the jury found him guilty of Felony Murder in the Second Degree with grand larceny serving as the underlying felony.  (Dkt. ##

11-5, O.R. at 1; 13-1, O.R. at 1377).  Second degree murder, as defined in OKLA. STAT. tit. 21, §

701.8, is a homicide that is "perpetrated by a person engaged in the commission of any felony."  In

order to find Petitioner guilty of Felony Murder in the Second Degree, the jury was instructed that

they must find that the following elements were proven beyond a reasonable doubt:

> First, the death of a human;
>
> Second, occurring as a result of an act or event which happened in the commission of a felony;
>
> Third, caused by the defendant or a person engaged with the defendant while in the commission of a felony;
>
> Fourth, the elements of the GRAND LARCENY defendant is alleged to have been in the commission of are as follows:
>
> > First, taking;
> > Second, carrying away;
> > Third, personal property;
> > Fourth, of another;
> > Fifth, valued at more than $500;
> > Sixth, by stealth;
> > Seventh, with the intent to deprive permanently.

(Dkt. # 13-1, O.R. at 1323).  Because the State's case against Petitioner relied heavily on the

testimony of Ridgway and Springer, self-proclaimed accomplices, the trial court also instructed the

jury that it had to determine whether Ridgway and Springer were in fact accomplices, and, should

the jury determine that they were accomplices, the need for sufficient corroboration of their

testimony, and the proper use of accomplice testimony.  Id. at 1346-52.

### a.    Insufficient corroboration for murder charge

Petitioner claims that the two accomplices, Springer and Ridgway, came forward "after they

were exposed to criminal charges in unrelated cases." (Dkt. # 1 at 35).  Petitioner argues that the

"accomplices' stories did not match each other, with each claiming that Justin Walker rode with

them from the crime scene," and that their "stories were not possible if the officers' testimony were [sic] true, since responding officers would have necessarily driven right past the fleeing Ridgway and Springer on their way to the scene." Id. Thus, Petitioner argues that the testimony of the accomplices was "inherently unreliable and unworthy of belief," and that "[n]o rational trier of fact could have believed [the jailhouse snitches'] testimony adequately corroborated the testimony of Ridgway and Springer." Id. at 36. Respondent argues that the testimony of Ridgway and Springer "was corroborated by the Petitioner's numerous admissions as well as other evidence" presented at trial. (Dkt. # 5 at 31, 48).

In Oklahoma, "testimony of an accomplice must be corroborated in at least one material fact by independent evidence." Moore v. Reynolds, 153 F.3d 1086, 1106 (10th Cir. 1998) (citing Spears v. State, 900 P.2d 431, 440 (Okla. Crim. App. 1995) (citing OKLA. STAT. tit. 22, § 742)). "Even slight evidence is sufficient for corroboration, but it must do more than raise a suspicion of guilt." Cullison v. State, 765 P.2d 1229, 1231 (Okla. Crim. App. 1988) (citations omitted). "However, corroborative evidence is not sufficient if it requires any of the accomplice's testimony to form the link between the defendant and the crime, or if it tends to connect the defendant with the perpetrators and not the crime." Glossip v. State, 157 P.3d 143, 152 (Okla. Crim. App. 2007) (citations omitted).

Here, the trial court did not, as a matter of law, determine whether Ridgway and Springer were accomplices to the murder. Instead, the trial court instructed the jury that it was to determine, based on the evidence, whether Ridgway and Springer were accomplices. See Dkt. # 13-1, O.R. at 1350. The record does not reflect whether the jury decided that these two men were Petitioner's accomplices and found the corroborating evidence sufficient, or whether it decided that these two men were not accomplices and thus no corroboration was necessary. The OCCA stated that the

"participation of Ridgway and Springer in this case was very controversial and susceptible to alternative findings.  The jury was appropriately thoroughly instructed on accomplice law . . . ." (Dkt. # 5-3 at 4).

On habeas review, this Court can set aside the determination by the OCCA only if it is objectively unreasonable.  The OCCA found "that the record reflects sufficient corroborative evidence was presented so as to prove beyond a reasonable doubt," that Petitioner was guilty of second degree felony murder.  Id. at 3-4.  While it is undisputed that there were some significant discrepancies between the testimony of Ridgway and Springer, see Dkt. # 9-13, Tr. Vol. XV at 37, this Court cannot weigh conflicting evidence.  Messer, 74 F.3d at 1013.  The State presented six witnesses who testified that Petitioner confessed to them that he killed Sheriff Woodrell. Additionally, the State presented evidence that corroborated Ridgway's testimony, including the location of the vehicles at Spess Oil and the recovery of a discarded syringe from the side of the road where Ridgway said he stopped and "shot up dope" after the murder.  (Dkt. # 9-13, Tr. Vol. XV at 35-36).  There is nothing in the record to persuade this Court that the OCCA's ruling was objectively unreasonable.

Finally, Petitioner argues that "if the jury believed these snitches, then they would have convicted [Petitioner] of the charged crime, first degree malice aforethought murder.  Instead, they found him guilty of second degree felony murder."  (Dkt. # 1 at 42).  The Supreme Court has "emphasized repeatedly the deference owed to the trier of fact and, correspondingly, the sharply limited nature of constitutional sufficiency review."  Glossip v. Trammell, 530 F. App'x 708, 742 (10th Cir. 2013) (unpublished) (citing Wright v. West, 505 U.S. 277, 296 (1992)).  The jury was presented with all of the discrepancies, inconsistencies, and lack of detail in the testimony of the

"jailhouse snitches."  This Court will not weigh the evidence for credibility.  Petitioner has failed

to show that a reasonable trier of fact would not agree with the jury decision and has failed to show

that the decision by the OCCA was objectively unreasonable.

### b.   Underlying felony

Petitioner claims that there was insufficient evidence to find Petitioner guilty of grand

larceny.  (Dkt. # 1 at 43-44).  Respondent argues that the State presented sufficient evidence to find

Petitioner guilty.  (Dkt. # 5 at 32).   Respondent states that the jury instructions identified the

elements of grand larceny, that Ridgway's testimony "alone was sufficient evidence for the jury to

find the items were stolen from Spess Oil," that Mr. Spess testified that the items described by

Ridgway "were found missing from one of his company's trucks within a week after the murder,"

and that Mr. Spess obtained an estimate for the replacement cost of the items missing in the amount

of $1,254.  (Dkt. # 5 at 32-33).  Petitioner claims that Ridgway's description of the equipment in the

truck did not match the description of the items given by Mr. Spess.  (Dkt. # 1 at 45).  Petitioner also

argues that replacement cost is not the proper measure of the value of stolen property.  Id.  On

appeal, the OCCA found the "evidence was sufficient for the jury to reasonably conclude that the

missing items were stolen the night of the Sheriff's murder and that the value of the items was over

$500.00."  (Dkt. # 5-3 at 5).

After reviewing the evidence in the light most favorable to the prosecution, this Court finds

that the OCCA's decision was not contrary to, or an unreasonable application of, federal law.  In

Oklahoma, the "correct scale for evaluating an item's value is its fair market value."  Jackson v.

State, 818 P.2d 910, 911 (Okla. Crim. App. 1991) (citing Gilbreath v. State, 555 P.2d 69 (Okla.

Crim. App. 1976)).  "[T]he owner of the stolen property who is familiar with its cost and use is

qualified to comment on its fair market value." Fixico v. State, 735 P.2d 580, 582 (Okla. Crim. App. 1987); Gilbreath, 555 P.2d at 70. "While the reasonable market value of the property at the time of the larceny was the question to be determined by the jury, any facts which would reasonably tend to enable them to intelligently determine such question was competent and proper." Filson v. Territory, 67 P. 473, 474 (Okla. 1901).

Here, the State presented two pieces of evidence to suggest the value of the items stolen exceeded $500.00. First, Mr. Spess identified the types of items that turned up missing from a welding truck. (Dkt. # 9-4, Tr. Vol. V at 120-123). Mr. Spess obtained an estimate from Bumper to Bumper, an auto parts specialist store in Cleveland, Oklahoma. It was estimated that it would cost $1,254.94 to replace the items missing from the welding truck. (Dkt. # 10-5, St. Ex. 29 at 8-9). Though Petitioner objected to the admission of the estimate into evidence based on relevance and foundation grounds, (Dkt. #9-4, Tr. Vol. V at 124-25), the evidence of the "value" was otherwise uncontested. Additionally, Mr. Spess testified that he knew the items were in working condition because he had personally used them a couple of days prior to the murder. Id. at 123.

Oklahoma courts have allowed evidence of replacement value to serve as evidence sufficient to show value for a conviction of grand larceny, notably when not contested. See Jackson v. State, 818 P.2d at 911-12. Oklahoma, along with several other states, also allows evidence that tends to enable a jury determine the reasonable market value of the property at the time of the larceny and use their common sense to evaluate the evidence. See Filson, 67 P. at 474; Harris v. State, 13 P.3d 489, 499 (Okla. Crim. App. 2000); see, e.g., Little v. Commonwealth, 722 S.E.2d 317, 320 (Va. Ct. App. 2012) (finding that replacement value, in certain situations, can afford the fact finder a basis from which to draw inferences as to the market value of the stolen item); State v. Cobrera, 300 P.3d

729, 731-32 (N.M. 2013) ("State may prove the amount of damage by introducing evidence of replacement cost" in combination with other testimony and evidence, and allow the jury to draw on its own knowledge and life experiences to determine the cost of repair or replacement); <u>State v. Jacquith</u>, 272 N.W.2d 90, 93 (S.D. 1978) (establishing that if "no market exists from which a fair market value could be ascertained, then the jury may properly use the 'replacement value less depreciation' test").  Here, the jury could collectively use its experience and common sense to determine that the 'reasonable market value' for the items missing from the truck was at least $500.00, based on the testimony that the replacement value was over $1,200.00 and the items were in "working condition."

      As proof that Petitioner was the one who stole the items from Spess Oil, Respondent offered the testimony of Mr. Spess and Ridgway.  Mr. Spess provided the description of the items that were discovered missing on the welding truck a little less than a week after the murder.  He stated that the missing items were copper welding leads, an oxygen bottle, an acetylene bottle, regulators from the bottles with gauges, hoses, and the cutting torch assembly.  (Dkt. # 9-4, Tr. Vol. V at 121).  Ridgway testified that, after returning to the area where Ridgway's vehicle was parked following the murder, Petitioner told Ridgway to "grab some tools out of a toolbox that was back there" on the truck.  (Dkt. # 9-8, Tr. Vol. IX at 118).  Ridgway testified that he saw "what appeared to be cutting torches, . . . two tanks . . . big ones, and there was . . . a small set [of tanks,] . . . a little Mig welder and a toolboxes [sic]."  <u>Id.</u> at 118-19.  Based on this combination of testimony, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  <u>Jackson</u>, 443 U.S. at 319.  Because the decision by the OCCA was not objectively unreasonable, the Court cannot overturn the OCCA's decision.  Petitioner is not entitled to habeas corpus relief on Ground IV.

### 4.    Ineffective assistance of trial counsel (part of Ground VII)

Embedded in Ground VII, Petitioner raises a claim of ineffective assistant of trial counsel. (Dkt. # 1 at 54).  Petitioner claims that his "trial counsel was ineffective for failing to request instructions that required the jury to consider Ridgway and Springer accomplices as a matter of law requiring them to find corroboration of their testimony." Id.  The OCCA found that Petitioner was not denied effective assistance of counsel because it "found the evidence did not support a finding that Ridgway and Springer were accomplices as a matter of law." (Dkt. # 5-3 at 9).  It stated that it "will not find counsel ineffective for failing to request an instruction which would have been denied." Id.  Respondent does not specifically address this ineffective assistance of trial counsel claim, but does state that the OCCA's decision is not contrary to federal law.  (Dkt. # 5 at 37).

Claims of ineffective assistance of trial counsel are analyzed under the two-pronged standard set forth in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a defendant must show that his counsel's performance was deficient and that the deficient performance was prejudicial. Strickland, 466 U.S. at 687; Osborn v. Shillinger, 997 F.2d 1324, 1328 (10th Cir. 1993).  A defendant can establish the first prong by showing that counsel performed below the level expected from a reasonably competent attorney in criminal cases.  Strickland, 466 U.S. at 687–88.  There is a "strong presumption that counsel's conduct falls within the range of reasonable professional assistance." Id. at 688.  In making this determination, a court must "judge . . . [a] counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id. at 690.  Moreover, review of counsel's performance must be highly deferential.  "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689.  To establish the second

37

prong, a defendant must show that this deficient performance prejudiced the defense, to the extent that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also Sallahdin v. Gibson, 275 F.3d 1211, 1235 (10th Cir. 2002); Boyd v. Ward, 179 F.3d 904, 914 (10th Cir. 1999).  This Court's review of the OCCA's decision on ineffective assistance of counsel claims is "doubly deferential." Cullen v. Pinholster, 131 S.Ct. 1388, 1403 (2011) (noting that a habeas court must take a "highly deferential" look at counsel's performance under Strickland and through the "deferential" lens of § 2254(d)).

To be entitled to habeas relief on his claim of ineffective assistance of trial counsel, Petitioner must demonstrate that the OCCA's adjudication of this claim is contrary to Strickland. The OCCA concluded that it could not find counsel ineffective when it had already determined that the trial court did not err in not finding Ridgway and Springer to be accomplices as a matter of law. This Court defers to that finding.  See infra Section C.3.  Thus, Petitioner has failed to show that counsel performed below the level expected from a reasonably competent criminal law attorney. Petitioner has failed to show that the OCCA's decision is contrary to the standard of Strickland. Habeas relief is denied.

## C.    State law claims (Grounds V, VI, VII)

Respondent argues that the claims raised in Grounds V, VI, and VII of Petitioner's habeas petition are matters of state law and are not subject to federal habeas corpus review.  (Dkt. # 5 at 37). In Ground V, Petitioner claims that the trial court erroneously admitted testimony of Petitioner's affiliation with the Universal Aryan Brotherhood gang, as well as testimony that Petitioner "allegedly solicited the murder of two of the State's witnesses."  (Dkt. # 1 at 47).  In Ground VI,

Petitioner claims that he was not given notice that he would have to defend against the charge of grand larceny as the basis for Second Degree Felony Murder. Id. at 51. In Ground VII, Petitioner claims that the trial court erred by not instructing the jury that Ridgway and Springer were accomplices as a matter of law. Id. at 54. In doing so, argues Petitioner, the court "lessened the State's burden of proof under Oklahoma law and violated [Petitioner]'s right to due process of the law." Id. Respondent states that Grounds V and VII are evidentiary matters and Ground VI concerns jury instructions and lesser included offenses. (Dkt. # 5 at 37-38). Respondent argues that these are state law matters and not proper for federal habeas review. Id.

A federal habeas court has no authority to review a state court's interpretation or application of its own state laws. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (emphasizing that it is not the province of a federal habeas court to reexamine state court determinations on state law questions). When conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. Id. at 68 (citing 28 U.S.C. § 2241; Rose v. Hodges, 423 U.S. 19, 21 (1975)). "In a habeas proceeding claiming a denial of due process, 'we will not question the evidentiary . . . rulings of the state court unless [the petitioner] can show that, because of the court's actions, his trial, as a whole, was rendered fundamentally unfair.'" Maes v. Thomas, 46 F.3d 979, 987 (10th Cir. 1995) (quoting Tapia v. Tansy, 926 F.2d 1554, 1557 (10th Cir. 1991)); Revilla v. Gibson, 283 F.3d 1203, 1212 (10th Cir. 2002) (habeas relief only if the evidence was "so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process"). "[W]e approach the fundamental fairness analysis with 'considerable self-restraint.'" Jackson v. Shanks, 143 F.3d 1313, 1322 (10th Cir. 1998) (quoting United States v. Rivera, 900 F.2d 1462, 1477 (10th Cir. 1990) (en banc )). A proceeding is

fundamentally unfair under the Due Process Clause only if it is "shocking to the universal sense of justice." <u>United States v. Russell</u>, 411 U.S. 423, 432 (1973) (internal quotation omitted).

### 1.      Petitioner's affiliation with the Universal Aryan Brotherhood  (Ground V)

Petitioner claims the trial court abused its discretion by "allowing the State to introduce highly prejudicial evidence regarding the Aryan Brotherhood." (Dkt. # 1 at 48).  The trial court denied Petitioner's motion in limine to exclude references during trial testimony to the Universal Ayran Brotherhood (UAB) and statements of fear of the UAB.  (Dkt. # 8-5, Tr. Hr'g Jan. 13, 2006 at 50).  Petitioner also claims that the trial court erred in allowing Daniel Reese and James Rather to testify that a hit was ordered on them because they testified against Petitioner.  (Dkt. # 1 at 48-49). Petitioner argues that this "improper and highly prejudicial evidence so infected the proceedings . . . [and] deprived [Petitioner] of the fair trial and due process guaranteed by the Constitution." <u>Id.</u> at 49.  Respondent argues that the "evidence was relevant to show why the witnesses feared the Petitioner and asked authorities for protection."  (Dkt. # 5 at 38).  In the alternative, Respondent argues that if it was error to allow this testimony, Petitioner "opened the door at trial" and cannot now complain about the invited error.  <u>Id.</u> at 38-39.  Additionally, Respondent claims that Petitioner's counsel failed to object to each reference to the gang at trial, "thereby waiving all but plain error." <u>Id.</u> at 39-40.

40

In its Summary Opinion, the OCCA distinguished Petitioner's case from <u>Dawson v. Delaware</u>, 503 U.S. 159 (1992).[11]   (Dkt. # 5-3 at 5).   In <u>Dawson</u>, the evidence of the Aryan Brotherhood was admitted during the sentencing phase of the trial, unlike at Petitioner's trial when it was admitted during the first stage of the trial.   <u>Id.</u>   This Court also notes that the trial court found that the UAB was mentioned by witnesses in passing during testimony and was relevant to the issue of witness credibility.   (Dkt. # 9-6, Tr. Vol. VII at 51-52).   The OCCA found the probative value outweighed the prejudicial nature of the evidence and determined the evidence was relevant to establish credibility and the motive of the witnesses testifying against Petitioner.   (Dkt. # 5-3 at 5). The OCCA concluded that Petitioner was not surprised by the testimony and had an opportunity to fully challenge the motivating factors of each witness during cross-examination.   <u>Id.</u>

The OCCA also determined the "hit" testimony from Reese and Rather did not warrant a reversal.   It found that any error that occurred during Reese's testimony was cured when the trial court admonished the jury.   <u>Id.</u>; <u>see</u> <u>also</u> Dkt. # 9-5, Tr. Vol. VI at 220.   As for Rather, the OCCA concluded that his testimony was "not volunteered, but was in a response to the State's question regarding why he was a former member of the Universal Aryan Brotherhood."   (Dkt. # 5-3 at 5-6). Further, it did not directly implicate Petitioner as the individual who called out the "hit" on Rather. <u>Id.</u> at 6; <u>see</u> <u>also</u> Dkt. # 9-6, Tr. Vol. VII at 12.

---

[11]At Dawson's sentencing phase, the prosecution read a stipulation, which stated that "the Aryan Brotherhood refers to a white racist prison gang that began . . . in California in response to other gangs of racial minorities.   Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware." <u>Dawson</u>, 503 U.S. at 159.   The Supreme Court held that the stipulation violated Dawson's First and Fourteenth Amendment rights because the evidence had no relevance to the issues being decided in the proceeding.   <u>Id.</u>   It "proved only the group's and Dawson's abstract beliefs, not that the group had committed or endorsed any unlawful or violent acts."   <u>Id.</u>

After reviewing the testimony, the Court finds that Petitioner was not denied due process. The trial court admonished the jury regarding certain testimony about the UAB and "hits" allegedly placed on certain witnesses.  Further, the trial court conducted a hearing and permitted voir dire examination of Rather and Petitioner in order to determine "the proper role of this evidence in this trial."  (Dkt. # 9-6, Tr. Vol VII at 42).  The trial court determined that, though the information was "irrelevant to the issues in this case," it was "relevant to the issue of the credibility [of the witnesses]."  Id. at 52.  Further, after Reese's second mention of the gang affiliation and stating that "a hit was put out on me by James Taylor," (Dkt. # 9-5, Tr. Vol. VI at 224), the trial court asked Petitioner's counsel to assist in preparing a cautionary instruction for the jury and, after a bench conference, Petitioner's counsel deferred on issuance of an admonishing instruction. Id. at 228-29. Petitioner has failed to show how the trial court abused its discretion or how this evidence "fatally infected" his trial and rendered the whole proceeding fundamentally unfair.  Habeas relief is denied.

## 2. Notice of grand larceny as a basis for second degree felony murder (Ground VI)

In Ground VI, Petitioner complains that he did not receive notice of the State's intention to use grand larceny as the underlying felony for Second Degree Felony Murder.  (Dkt. # 1 at 51).  He argues that the State proceeded throughout the trial with the charge of Malice Aforethought Murder in the First Degree.  Id.  It was not until the close of evidence that the State requested jury instructions for Felony Murder in the Second Degree and First Degree Misdemeanor Manslaughter. (Dkt. # 9-13, Tr. Vol. XV at 9-10).  Petitioner argues that "[h]ad the defense been on notice that it needed to defend against a grand larceny charge, in addition to the first degree murder charge, it would have adapted its strategy accordingly."  (Dkt. # 1 at 52).  Respondent contends that the facts of this case put Petitioner "on notice of the charge [of Second Degree Felony Murder] as a lesser

included offense of first degree murder." (Dkt. # 5 at 44).  Respondent argues that the evidence of larceny was presented at the preliminary hearing and that it was the "State's theory all along" that Petitioner and Walker murdered the Sheriff "when he surprised them in the course of their larceny at Spess Oil." Id. at 45.

The OCCA stated that "[a] defendant is deemed to know that he may be convicted of the greater crime with which he is charged and any lesser included offense whether the lesser included offense is pled in the Information or not." (Dkt. # 5-3 at 6 (citing Scott v. State, 107 P.3d 605, 606 (Okla. Crim. App. 2005))).  The OCCA concluded that the evidence presented at the preliminary hearing was sufficient to put Petitioner on notice of the grand larceny charge. Id. at 6-7.  Further, the OCCA found that Petitioner failed to show that "he was surprised or denied a substantial right by the failure to charge him in a felony information with grand larceny." Id. at 7.

Generally, matters concerning the giving of jury instructions are considered questions of state law and not proper subjects of federal habeas corpus review under 28 U.S.C. § 2254. Patton v. Mullin, 425 F.3d 788, 807 (10th Cir. 2005).  It "has long been recognized that [a lesser included offense] can . . . be beneficial to the defendant because it affords the jury a less drastic alternative to the choice between conviction of the offense charged and acquittal." Beck v. Alabama, 447 U.S. 625, 633 (1980).  "It is axiomatic that an indictment or charging information for one crime carries with it notice that lesser offenses included within the specified crime . . . and must be defended against." McHam v. Workman, 247 F. App'x 118, 120 (10th Cir. 2007) (unpublished).  Based on the record, Petitioner was on notice of the grand larceny felony when the State introduced evidence and testimony at preliminary hearing on the estimated value of the items missing and the time when the items were found to be missing from Spess Oil.  Petitioner fails to show that the lesser included

offense instructions rendered the trial unfair or that he was denied due process.  Habeas corpus relief is denied.

### 3.    Failure to instruct jury that Ridgway and Springer were accomplices as a matter of law (Ground VII)

In Ground VII, Petitioner claims that the trial court erred when it failed to instruct the jury "that Ridgway and Springer were accomplices as a matter of law.  Consequently, [Petitioner]'s jury was free to find that Ridgway and Springer were not accomplices, and that there [sic] testimony need not be corroborated in order to convict [Petitioner]."  (Dkt. # 1 at 54).  Respondent argues that "[t]here is no federal constitutional requirement that an accomplice's testimony be corroborated." (Dkt. # 5 at 46).  Thus, this is a state law issue "that does not afford relief under habeas corpus."  Id. The OCCA stated that in order to "be adequate, corroborative evidence must tend in some degree to connect the defendant to the commission of the offense charged without the aid of the accomplice's testimony."  (Dkt. # 5-3 at 3).  The OCCA found that if the jury "required corroboration of the testimony of Ridgway and Springer, the record reflects sufficient corroborative evidence was presented so as to prove beyond a reasonable doubt [that Petitioner was] guilty of second degree felony murder."  (Dkt. # 5-3 at 3-4).

It is well established that "errors in jury instructions in a state criminal trial are not reviewable in federal habeas corpus proceedings, 'unless they are so fundamentally unfair as to deprive petitioner of a fair trial and to due process of law.'"  Nguyen v. Reynolds, 131 F.3d 1340, 1357 (10th Cir. 1997) (quoting Long v. Smith, 663 F.2d 18, 23 (6th Cir. 1981)); see also Maes v. Thomas, 46 F.3d 979, 984 (10th Cir. 1995) ("A state trial conviction may only be set aside in a habeas proceeding on the basis of erroneous jury instructions when the errors had the effect of rendering the trial so fundamentally unfair as to cause a denial of a fair trial.").  The burden on a

petitioner attacking a state court judgment based on a refusal to give a requested jury instruction is especially great because "'[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.'" Maes, 46 F.3d at 984 (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).

The question of whether an individual is an accomplice is a matter of state law.  In Oklahoma, the test for this determination is whether the individual could have been indicted for the same crime of which the accused is charged.  Anderson v. State, 992 P.2d 409, 418 (Okla. Crim. App. 1999); Jones v. State, 128 P.3d 521, 538 (Okla. Crim. App. 2006).  While Ridgway and Springer readily admit they were present at Spess Oil with Petitioner and Walker on the night of the murder, both testified that they were asleep inside a vehicle while at Spess Oil and were there only because each was asked to bring bolt cutters.  See Dkt. # 9-5, Tr. Vol. VI at 49, 61; Dkt. # 9-8, Tr. Vol IX at 80, 89-90.  Whether their actions resulted in accomplice liability is a matter of state law. The jury was properly and thoroughly instructed on accomplice liability and the necessity of corroborating accomplice testimony.  Petitioner has failed to show that the jury instructions were so fundamentally unfair that they deprived him of a fair trial.  Habeas relief is denied.

## D.     Procedural Bar (Ground III)

In Ground III, Petitioner claims the trial court deprived him of "the right to present a defense that some other person committed the crime and to rebut or impeach OSBI investigator Dennis Francini's [sic] claim that all other suspects had been eliminated."  (Dkt. # 1 at 22).  Petitioner claims he was denied the opportunity to present certain testimony at trial to support his theory of a third party perpetrator and that he has new evidence supporting that theory of defense, which arose after his application for post-conviction relief hearing at the trial court.  Id. at 23-29.  Petitioner

45

attributes his failure to raise this claim on direct appeal to ineffective assistance of appellate counsel. Id. at 33.  Petitioner presented this claim to the OCCA on post-conviction appeal.  (Dkt. # 5-9 at 3).

The doctrine of procedural default prohibits a federal court from considering a specific habeas claim where the state's highest court declined to reach the merits of that claim on independent and adequate state procedural grounds, unless a petitioner "demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate[s] that failure to consider the claim[] will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 724 (1991); see also Maes, 46 F.3d at 985; Gilbert v. Scott, 941 F.2d 1065, 1067-68 (10th Cir. 1991).  "A state court finding of procedural default is independent if it is separate and distinct from federal law." Maes, 46 F.3d at 985.  A finding of procedural default is an adequate state ground if it has been applied evenhandedly "'in the vast majority of cases.'" Id. (citation omitted).

When a state court imposes an independent and adequate procedural bar, this Court may not consider the claims unless the petitioner is able to show cause and prejudice for the default, or demonstrate that a fundamental miscarriage of justice would result if his claims are not considered. See Coleman, 501 U.S. at 750.  The cause standard requires a petitioner to "show that some objective factor external to the defense impeded . . . efforts to comply with the state procedural rules." Murray v. Carrier, 477 U.S. 478, 488 (1986).  Examples of such external factors include the discovery of new evidence, a change in the law, and interference by state officials. Id.  As for prejudice, a petitioner must show "'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 168 (1982).  The "fundamental miscarriage of justice" exception to a procedural bar applies "in an extraordinary case, where a constitutional

46

violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 495-96 (1986); Herrera v. Collins, 506 U.S. 390, 403-04 (1993); Sawyer v. Whitley, 505 U.S. 333, 339-41 (1992); Schlup v. Delo, 513 U.S. 298 (1995). A "fundamental miscarriage of justice" requires a petitioner to demonstrate that he is "actually innocent" of the crime of which he was convicted. McCleskey v. Zant, 499 U.S. 467, 494 (1991).

In its order affirming the denial of post-conviction relief, the OCCA stated that "[a]ny issue that could have been previously raised, but was not, is waived, and may not be the basis of a subsequent post-conviction application." (Dkt. # 5-8 at 1 (citing Webb v. State, 835 P.2d 115 (Okla. Crim. App. 1991); OKLA. STAT. tit. 22, § 1086). The state court's procedural bar, as applied to Petitioner's claims, was an "independent" ground because Petitioner's failure to comply with state procedural rules was "the exclusive basis for the state court's holding." Maes, 46 F.3d at 985. Based on OKLA. STAT. tit. 22, § 1086, the OCCA routinely bars claims that could have been but were not raised on direct appeal or in the application for post-conviction appeal. As a result, the procedural bar imposed by the OCCA was "adequate" to preclude habeas corpus review. Thus, in order for the Court to grant relief, Petitioner must show cause and prejudice for the default, or demonstrate that a fundamental miscarriage of justice would result if his claims are not considered. See Coleman, 501 U.S. at 750.

Petitioner argues ineffective assistance of appellate counsel as "cause" for his failure to raise this claim on direct appeal. To establish "cause" sufficient to overcome the procedural bar based on ineffective assistance of appellate counsel, Petitioner must satisfy both prongs of the test established in Strickland; that is, he must show that his attorney's representation fell below an objective standard of reasonableness and that counsel's errors prejudiced the defense. Strickland,

466 U.S. at 687.  "Judicial scrutiny of the adequacy of attorney performance must be strongly deferential: '[a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'"  United States v. Blackwell, 127 F.3d 947, 955 (10th Cir. 1997) (quoting Strickland, 466 U.S. at 689).  "Moreover, the reasonableness of the challenged conduct must be evaluated from counsel's perspective at the time of the error."  Id.; accord Kimmelman v. Morrison, 477 U.S. 365, 381 (1986); Strickland, 466 U.S. at 689.  Prejudice, under the second prong, is shown by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the appeal would have been different."  Strickland, 466 U.S. at 694.  "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  Id. at 697.

The Sixth Amendment "does not require an attorney to raise every nonfrivolous issue on appeal."  Banks v. Reynolds, 54 F.3d 1508, 1515 (10th Cir. 1995) (citing Jones v. Barnes, 463 U.S. 745, 751 (1983)).  "It is completely reasonable, and in fact advisable, for appellate counsel to eliminate weak but arguable claims and pursue issues on appeal which are more likely to succeed."  Jackson v. Shanks, 143 F.3d at 1321; see Hawkins v. Hannigan, 185 F.3d 1146, 1152 (10th Cir. 1999) (if omitted issue is meritless, then counsel's failure to raise it on appeal is not constitutionally ineffective assistance).  "If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance. . . ."  Cargle v. Mullin, 317 F.3d 1196, 1202 (10th Cir. 2003).  If the omitted issue "has merit but is not so compelling . . . [the court must assess] . . . the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient

performance." Id.; see also Hawkins, 185 F.3d at 1152 (if omitted issue is meritless, then counsel's failure to raise it on appeal is not constitutionally ineffective assistance).  The merits of Petitioner's procedurally-defaulted claim must therefore be examined to determine whether his appellate counsel's representation was constitutionally deficient.

Petitioner claims the trial court prevented him from presenting three witnesses in support of his theory of defense.  First, Petitioner claims that the trial court "refused to permit the testimony of Jeremy Heitman[, that Russell could have been at Spess Oil,] because the defense could not produce 'a single witness in this case that testifies that Ed Russell was at Spess Oil, has personal knowledge of that . . . .'" (Dkt. # 1 at 25).  Petitioner claims the trial court excluded Heitman's testimony "in its entirety [because] 'there is not a single fact that could be obtained from the testimony . . . that would be appropriate in this case.'" Id.   Second, Petitioner claims that the trial court "refused to permit the videotape [recording of the police interview of Richard Bowline] to be played for the jury on the grounds that it was hearsay not coming within any exception."  Id. at 26.  Petitioner claims the court determined this evidence to be "not relevant because no witness had personal knowledge that Mr. Russell or Mr. Bowline were at Spess Oil at the time of the homicide." Id.  Lastly, Petitioner was unable to present the testimony of Kristy Kay Timmerman "because she invoked her fifth amendment privilege against self-incrimination [and t]he trial court refused to grant her immunity even though Ms. Timmerman had given statements about the information she had to law enforcement twice and to defense counsel once."  Id. at 27.

After a review of the state record and transcripts, the Court finds that the omitted issues raised in Ground III are meritless.  Thus, Petitioner's claim of ineffective assistance of appellate counsel cannot serve as "cause" to overcome the procedural bar applicable to the claim that the trial

court denied Petitioner the opportunity to present a third party perpetrator defense. "The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Gore v. State, 119 P.3d 1268, 1275 (Okla. Crim. App. 2005) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986), amended by, 2005 WL 2098027 (Okla. Crim. App. Aug. 30, 2005). In Holmes v. South Carolina, 547 U.S. 319 (2006), the Supreme Court reiterated the fact that trial judges are permitted to exclude evidence

> proffered by criminal defendants to show that someone else committed the crime with which they are charged . . . where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial.

Id. at 327. In Oklahoma, "a criminal defendant has a right to present evidence in his own defense, but must comply with the same evidentiary and procedural rules that are applicable to the State." Pavatt v. State, 159 P.3d 272, 289 (Okla. Crim. App. 2007) (citing Gore, 119 P.3d at 1275). The OCCA has stated that whether a defendant "'was denied the right to present a defense ultimately turns on whether the evidence at his disposal was admissible.'" Summers v. State, 231 P.3d 125, 147 (Okla. Crim. App. 2010) (quoting Pavatt, 159 P.3d at 287). Further, Oklahoma courts have long required "evidence of acts or circumstances that clearly point to another . . . ; the evidence must show an overt act by the third person toward the commission of a crime." Dodd v. State, 100 P.3d 1017, 1033 (Okla. Crim. App. 2004) (citing Woodruff v. State, 846 P.2d 1124, 1137 (Okla. Crim. App. 1993)); see also Irvin v. State, 146 P. 453 (Okla. Crim. App. 1915).

Petitioner fails to show that the testimony from Jeremy Heitman and the video recording of Richard Bowline were admissible. Heitman was expected to testify that, on the night of October 12,

2001, he observed Ed Russell and Edrow Roberts at the Bowline residence, in Hallett, Oklahoma,[12] to purchase an orange Chevy pickup truck from Richard Bowline, but were having trouble getting the truck running.  (Dkt. # 9-10, Tr. Vol. XI at 26-28).  The truck needed a battery and a starter.  Id. at 27-28.  Heitman was then expected to testify that "around midnight, everyone left, and he remained behind at the Bowline residence."  Id. at 28-29.  Heitman left the Bowline resident early on the morning of October 13, 2001, on a hunting trip, but when he returned to the Bowline residence around noon, he observed Russell working on the truck with Richard Bowline.  Id. at 29.  When Heitman went inside, Buttons Bowline, Richard's wife, was "freaking out" and packing clothes into suitcases.  Id.  Heitman claims Buttons told him that she was in a panic "[b]ecause those guys shot the sheriff."  Id.  Petitioner claims Buttons made this statement to Heitman "before the news of the slaying was made public."  (Dkt. # 1 at 23).  Finally, Petitioner's trial counsel wanted to use Heitman's testimony to contradict the videotaped statement of Richard Bowline – the statement that "he and Buttons were at home when [Heitman] claims that they had left."  Id. at 30.  Petitioner's counsel argued that their theory was that Russell, Robertson, and the Bowlines were together that night when Russell was at Spess Oil stealing a starter for the Chevy truck.  Id. at 30-32.

The trial court barred the admission of the Heitman's testimony for several reasons.  First, the trial court stated that when Heitman "first gave his statement, he didn't know [the] names [of Russell and Roberts], and then he gave a second statement and he said that he learned from somebody else what their names were."  (Dkt. # 9-10, Tr. Vol. XI at 26-27).  Second, the trial court noted that Buttons' alleged statement to Heitman was "hearsay within hearsay."  Id. at 29.  The court

---

[12]The Court takes notice that Hallett, Oklahoma is approximately 10 miles from Cleveland, Oklahoma.

concluded that Heitman's sworn statements were "so riddled with suspicion and opinion based upon what other people allegedly told him, that there is not a single fact that could be obtained from the testimony of Mr. Heitman that would . . . be appropriate in this case." Id. at 34. Finally, the trial court also concluded that the testimony was "not relevant in view of the fact that there is not a single witness who has put Mr. Bowline . . . at Spess Oil [on] the morning of October 13th, 2001. And the defense is not entitled to interject in this trial conjecture, speculation, surmise, in [sic] that Mr. Bowline was present, . . . or speculation of Mr. Heitman or some other witness." Id. at 34-35. Petitioner has failed to demonstrate that the trial court abused its discretion in barring Heitman's testimony. There is no merit in this claim.

As for the video recording of the police interview with Richard Bowline, the trial court concluded that there was no exception to the hearsay rule that would allow the video to be admissible, id. at 9, even though Richard Bowline was deceased at the time of the trial, id. at 5. Petitioner's trial counsel argued that the statements on the tape were not being offered for the truth of the matter asserted. Id. at 6. Instead, the video was being more as rebuttal, to show what information investigators received from Mr. Bowline concerning Ed Russell, because investigators had "given different statements, and vague statements, as to what Mr. Bowline told them in regard to Ed Russell, and conflicting statements" during their testimony at trial. Id. at 6. The court disagreed, stating that the video was being offered for the truth of the matter asserted and it was "cumulative, because this issue has already been addressed with the [testimony of the] investigators." Id. at 9.

Petitioner also implies that the reasons stated by the trial court barring admission of the videotaped interview "placed a burden on the defense of being able to establish by direct evidence

the guilt of alternate suspects as a predicate to admissibility of evidence that some other person was the perpetrator."  (Dkt. # 1 at 26).  In Oklahoma, "proof of an overt act in the commission of a crime is . . . a threshold showing" for a defense theory of third party perpetrator.  Gore, 119 P.3d at 1275-76.  The OCCA has stated that,

> [The] test for determining the admissibility of third party perpetrator evidence is based upon more than the single finding of an overt act in the commission of the crime, the standard is not too strict and is consistent with constitutional principles. It does not prevent the defendant from presenting a defense or presenting evidence that another person may have committed the crime as long as there is some quantum of evidence, which is more than mere suspicion and innuendo, that connects the third party to the commission of the crime. It does not directly control the scope of defense counsel's argument to the jury and counsel is allowed to argue any inference that can be fairly drawn from the evidence.

Id. at 1276.  Petitioner's implication that the trial court placed an unfair burden of proof upon Petitioner falls short.  Petitioner fails to show how the video of Richard Bowline's statement to investigators is more than "mere suspicion and innuendo."  Petitioner fails to demonstrate that the trial court abused its discretion in barring this evidence.  There is no merit in this claim.

Finally, Petitioner argues that the trial court erred when it failed to grant transactional immunity to Kristy Kay Timmerman so that she could testify at Petitioner's trial.  (Dkt. # 1 at 27). Petitioner expected Timmerman to testify in accordance with her statements to investigators: that Ed Russell had confessed to her that he shot a cop, that he wanted her to get rid of a gun, and that he wanted her to help "hide him out" with her family in Arkansas.  Id. at 31.  Timmerman made these statements to investigators and her statements were addressed during the testimonies of OSBI Deputy Inspector Dennis Franchini, and Pawnee County District Attorney Investigator Mike Shea. See Dkt. # 9-7, Tr. Vol. VIII at 99-103; 120-122; Dkt. # 9-8, Tr. Vol. IX at 5-13; 19-30.

Timmerman was subpoenaed to testify at Petitioner's trial, but filed a motion to quash the subpeona.  (Dkt. # 13-1, O.R. at 1294).   Represented by counsel, Timmerman argued that the "subject matters that she is expected to testify on would potentially incriminate her in a number of potential causes of action, and . . . one federal investigation that is currently ongoing in the Northern District of Oklahoma."  (Dkt. # 9-9, Tr. Vol. X at 115-16).  The trial court noted that Petitioner had "already gotten before the jury that this witness made statements that Mr. Russell had incriminated himself."  Id. at 122.  Petitioner's counsel argued, however, that even though they were "allowed to go into some of her statements, during the State's case in chief, [her statements] were not offered for the truth of the matter asserted . . . ."  Id. at 117. Petitioner's counsel also argued that Petitioner's "right to present a defense under these circumstances trumps Kristy Kay Timmerman's right against self-incrimination since she has already talked about the subject of both her direct and cross-examination repeatedly, both to law enforcement and to myself."  Id.

The court held a closed hearing and, after Timmerman admitted that she had been interviewed by investigators a couple of times in this case, she invoked the Fifth Amendment in response to all other questions.  (Dkt. # 9-10, Tr. Vol. XI at 18-19).  The trial court declined to grant immunity and explained that even if it "were to grant immunity, . . . she still has the problem of the federal – the opportunity that the federal government has, as referenced yesterday, and so I decline to [grant immunity] where it would be meaningless, and it would be here."  Id. at 20.  Petitioner claims that "Ms. Timmerman should have been required to testify.  The statute of limitations in Oklahoma for prosecuting most public offenses was three (3) years and would have immunized Ms. Timmerman from prosecution . . . ."  (Dkt. # 1 at 31-32).

In Oklahoma, two sections of the Oklahoma constitution are relevant here: Article II, §§ 21, 27. Section 21 provides that "[n]o person shall be compelled to give evidence which will tend to incriminate him, except as in this Constitution specifically provided." Section 27 provides that,

> Any person having knowledge or possession of facts that tend to establish the guilt of any other person or corporation under the laws of the state shall not be excused from giving testimony or producing evidence, when legally called upon so to do, on the ground that it may tend to incriminate him under the laws of the state; but no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may so testify or produce evidence. All other provisions of the Constitution or the laws of this state in conflict with the provisions of this constitutional amendment are hereby expressly repealed.

Oklahoma courts have found that Section 27 does not conflict with Section 21 because Section 27 "only deals with a person who has knowledge of facts that [t]end to establish the guilt of [a]ny other person charged with [a]n offense." Pate v. State, 429 P.2d 542, 546 (Okla. Crim. App. 1967). Section 27 "distinctly sets forth" four requirements that must be present in order for it to be applicable to a witnesses' testimony. Id. "First, 'a person must have facts or knowledge tending to establish the guilt'; Second, 'of any other person or corporation'; Third, 'charged with an offense against the laws of the State'; Fourth, 'when legally called upon so to do'." Id.

As applied to this case, Timmerman's anticipated testimony does not tend to establish the guilt of another person charged with an offense against the laws of Oklahoma. Instead, Timmerman's testimony suggests the guilt of a person, Ed Russell, who was not a co-defendant in Petitioner's case, nor was he charged with an offense against the laws of Oklahoma relating to the murder of Sheriff Woodrell. Thus, the elements required are not present and "no court has jurisdiction to compel a person to testify or hold him in [c]ontempt if he refuses." Id.

In summary, this Court finds that there is no merit to the claims underlying Petitioner's allegation of ineffective assistance of appellate counsel.   Therefore, ineffective assistance of appellate counsel cannot serve as "cause" to overcome the procedural bar.

Finally, in Ground III, Petitioner also raises a claim of new evidence to support his third party perpetrator defense.  Petitioner states that after the district court hearing on the application for post-conviction relief, Petitioner's counsel received a phone call from Crystal Crawley.[13]  (Dkt. # 1 at 29).   In his petition, Petitioner states that he "informed the Court of Criminal Appeals [of this new evidence] when appealing the denial of post-conviction relief . . . , but the Court . . . did not address it."   Id.   In its Order Affirming Denial of Post-Conviction Relief, the OCCA stated that "[a]ny issue that could have been previously raised, but was not, is waived and may not be the basis of a subsequent post-conviction application."  (Dkt. # 5-8 at 1 (citing Webb v. State, 835 P.2d 115, 116 (Okla. Crim. App. 1992) and OKLA. STAT. tit. 22, § 1086).   Webb states that "all grounds of relief available to an applicant under the Post-Conviction Procedure Act must be raised in the original application and that any ground not so raised, or bypassed, may not be the basis for a subsequent application."   Id. at 116.   Further, Oklahoma deems waived, claims that were not raised on direct appeal or in an initial application for post-conviction relief.   See Johnson v. State, 823 P.2d

---

[13]Crawley stated that she and a friend, Lonna Adams, met a man named Rob Johnson, who knew Justin Walker.  (Dkt. # 1 at 29) When Adams asked Johnson about Walker, Johnson purportedly said,

> 'Oh yeah, that is the guy who went to prison for that Sheriff that he didn't kill.'  He then laughed and said, 'and ya know the funniest part is that my buddy Ed Russell did that.'  He went on to say, 'yeah, Ed had asked if he could borrow a gun then when he brought it back he said thanks but you might wanna get rid of it because it killed a sheriff.'

(Dkt. # 1 at 29).

370, 373 (Okla. Crim. App. 1991); Robison v. State, 818 P.2d 1250, 1251 (Okla. Crim. App. 1991); Medlock v. Ward, 200 F.3d 1314, 1322-23 (10th Cir. 2000) (citing OKLA. STAT. tit. 22, § 1086). As a result, the procedural bar was "adequate" to preclude habeas review. The state court's procedural bar, as applied to Petitioner's claim of new evidence in Ground III, was an "independent" ground because Petitioner's failure to comply with state procedural rules was "the exclusive basis for the state court's holding." Maes, 46 F.3d at 985.

As "cause" for failure to raise this claim in his application for post-conviction relief, Petitioner states that this "new evidence" was not discovered until after the hearing for post-conviction relief. (Dkt. # 1 at 29). For purposes of his habeas petition, Petitioner fails to show that some "objective factor external to the defense" impeded his ability to return to the district court and raise this claim of new evidence. Thus, Petitioner fails to show "cause" for the defaulted claim.

After reviewing the three claims underlying Petitioner's claim of ineffective assistance of appellate counsel and Petitioner's claim of new evidence in Ground III, the Court concludes that Petitioner has failed to show "cause" sufficient to overcome the procedural bar. Thus, unless Petitioner can demonstrate that a fundamental miscarriage of justice would result if his claims are not considered, the Court will deny relief. See Coleman, 501 U.S. at 750.

The "fundamental miscarriage of justice" exception to the procedural bar doctrine applies "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent." Carrier, 477 U.S. at 495-96 (1986); see also Herrera, 506 U.S. at 403-04; Sawyer v. Whitley, 505 U.S. 333, 339-41 (1992); Schlup v. Delo, 513 U.S. 298 (1995). To meet this test, a criminal defendant must make a colorable showing of factual innocence. Beavers v. Saffle, 216 F.3d 918, 923 (10th Cir. 2000) (citing Herrera, 506 U.S. at 404). "The miscarriage of

justice exception, . . . applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted [the petitioner].'" McQuiggin v. Perkins, 133 S. Ct. 1924, 1933 (2013) (quoting Schlup, 513 U.S. at 329) (internal quotation marks omitted).  Under Schlup, a showing of innocence sufficient to allow consideration of procedurally barred claims must be "so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error . . . ." Schlup, 513 U.S. at 316.  The petitioner must "support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Id. at 324.

Petitioner asserts that "he has proclaimed his innocence of this crime since day one" and "that he was not there" when the Sheriff was murdered.  (Dkt. # 1 at 32).  Further, in Ground III, Petitioner alleges that he has new evidence to support his claim that Ed Russell killed Sheriff Woodrell, and that he was deprived of the right to present a third party perpetrator defense.  Id. at 22-33.  Additionally, in Grounds I and II, Petitioner asserts claims of exculpatory evidence and "newly discovered evidence" that some witnesses recanted their testimony, gave false testimony, or received deals in exchange for their testimony.  Id. at 8-20.  However, Petitioner falls short of showing innocence sufficient to allow consideration of the procedurally barred claims.  The new evidence is not exculpatory scientific evidence, new eyewitness accounts, or physical evidence.  In fact, this Court has already concluded, in Grounds I and II, that the exculpatory evidence and "newly discovered" evidence was impeachment evidence, rather than evidence to support a claim of actual innocence.  Petitioner has failed to show that the evidence is "so strong that [this C]ourt cannot have

confidence in the outcome of the trial." <u>Schlup</u>, 513 U.S. at 316.  Therefore, the Court concludes that Petitioner does not fall within the narrow "fundamental miscarriage of justice" exception.

Having failed to demonstrate cause and prejudice or that a fundamental miscarriage of justice will result if this Court does not consider his claims, the Court finds that Petitioner's claims raised in Ground III are procedurally barred. Habeas corpus relief requested shall be denied on that basis.

**D.**     **Certificate of appealability**

Rule 11, <u>Rules Governing Section 2254 Cases in the United States District Courts</u>, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."   Pursuant to 28 U.S.C. § 2253, the court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the court "indicates which specific issue or issues satisfy [that] showing."   A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings.  <u>Slack v. McDaniel</u>, 529 U.S. 473, 483-84 (2000) (citing <u>Barefoot v. Estelle</u>, 463 U.S. 880, 893 (1983)). In addition, when the court's ruling is based on procedural grounds, the petitioner must demonstrate that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Slack</u>, 529 U.S. at 484.

After considering the record in this case, the Court concludes that a certificate of appealability should not issue.  Nothing suggests that the Tenth Circuit would find that this Court's application of AEDPA standards to the decision by the OCCA was debatable amongst jurists of reason.  <u>See Dockins v. Hines</u>, 374 F.3d 935 (10th Cir. 2004).  As to the claims denied on a

procedural basis, Petitioner has failed to satisfy the second prong of the required showing, i.e., that the Court's ruling resulting in the denial of the claims on procedural grounds was debatable or incorrect. The record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently. A certificate of appealability shall be denied.

### CONCLUSION

After careful review of the record, the Court concludes that Petitioner has not established that he is in custody in violation of the Constitution or laws of the United States. Therefore, the petition for writ of habeas corpus shall be denied.

**ACCORDINGLY, IT IS HEREBY ORDERED** that,

1. The clerk shall substitute Anita Trammell, Warden, in place of Randy Workman, Warden, as party respondent.

2. The petition for writ of habeas corpus (Dkt. # 1) is **denied**.

3. A certificate of appealability is **denied**.

4. A separate judgment shall be entered in this matter.

**DATED** this 21st day of February, 2014.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE